ELIZABETH E. BUFORD v. ROBERT GUSTAV GRUBER and CASPER WILLIAM GRUBER, Minors, and WALTER B. WADDELL and JOHN CHAMBERLAIN, Executors, Appellants.

Division Two, November 23, 1909.

1. **WILL: Delusion.** A delusion which incapacitates a person from making a will, is the conception of the existence of something extravagant which has no existence whatever, but of which the person entertaining it is incapable of becoming permanently disabused by argument, reason or proof. Where the testator's aversion to a child is the result of an insane delusion, and his conduct in disinheriting her cannot be explained on any other ground, his will should be set aside.

2. ——: ——: **Weight of Evidence.** Where there is any competent evidence tending to show the insanity of the testator, in that he possessed an insane delusion that his disinherited daughter was not his child, and that his will was the offspring of such delusion, the court cannot disturb the verdict of the jury finding that the paper was not his will. There being competent evidence to that effect, the court will not say the jury placed a wrong estimate upon the weight of the evidence.

3. ——: ——: **Range of Evidence.** Where a charge of insanity is made against a testator, testimony to show the condition of his mind long prior to and closely approaching the time of the execution of his will, and shortly subsequent thereto, is competent to show the condition of his mind at the very moment of its execution.

4. ——: ——: **As to Legitimacy of Child.** Where a father entertained the false delusion that his daughter was not his child, and that operated in the making of his will, whose only purpose was to disinherit her, and there is evidence that he labored under that delusion for some time and at the very time of making the will, a verdict setting aside the will, the instructions being without error, will be sustained on appeal.

5. ——: ——: **Continuance.** Where an insane delusion is once shown to exist, the jury are justified, in the absence of a showing to the contrary, in finding that it continued down to the very time of the execution of the will, especially when that delusion is shown to have had its origin in constant and excessive intoxication, which itself continued to the time of the will's execution and his death.

Appeal from Lafayette Circuit Court.—*Hon. Samuel Davis,* Judge.

AFFIRMED.

*H. C. Wallace* and *William Aull* for appellants.

(1)   The court erred in overruling the demurrer to the evidence and in refusing to give a peremptory instruction directing the jury to return a verdict sustaining the will. The evidence clearly shows that the testator had sufficient capacity to make the will at the time he executed it. Techenbrook v. McLaughlin, 209 Mo. 540; Western v. Hanson, 111 S. W. 49; Archambault v. Blanchard, 198 Mo. 384; Harvey v. Sullens'

Heirs, 56 Mo. 372; Southworth v. Southworth, 173 Mo. 59; Couch v. Gentry, 113 Mo. 248; Hamon v. Hamon, 180 Mo. 685; Jackson v. Hardin, 83 Mo. 175; Schierbaum v. Schemme, 157 Mo. 1; Von de Veld v. Judy, 143 Mo. 345; Riggin v. Westminster College, 160 Mo. 579. (2) Neither courts nor juries can make wills for men and they ought to be careful in unmaking them. Jackson v. Hardin, 83 Mo. 185. (3) This court seems committed to the proposition that where there is a will there is not always a way to break it. Story v. Story, 188 Mo. 128; Wood v. Carpenter, 166 Mo. 465; Tibbe v. Kamp, 154 Mo. 545. (4) The law presumes that the testator was of sound mind and that the will expresses the purpose and intention of the testator. Jackson v. Hardin, 83 Mo. 175; Weston v. Hanson, 212 Mo. 248; Riggin v. Westminster College, 160 Mo. 579; Maddox v. Maddox, 114 Mo. 35; Carl v. Gabel, 120 Mo. 283; McFadin v. Catron, 138 Mo. 197; Fulbright v. Perry Co., 145 Mo. 432; Sehr v. Lindemann, 153 Mo. 276; Tibbe v. Kamp, 154 Mo. 545; Schierbaum v. Schemme, 157 Mo. 7. (5) A testator may if mentally competent dispose of his property as he sees fit. He may be capricious, harsh and even cruel in his scheme of disposition, and this fact will not invalidate the will. No testator is bound to act kindly or even justly or equitably in making his will. Weston v. Hanson, 212 Mo. 248; Catholic University v. O'Brien, 181 Mo. 68; McFadin v. Catron, 138 Mo. 197; Hughes v. Rader, 183 Mo. 630; Roberts v. Bartlet, 190 Mo. 680; Crowson v. Crowson, 172 Mo. 691; Chaplin on Wills, p. 24; Hearth v. Zable, 17 S. W. 360 (Ky.). A testator may discriminate between children if he desires. Hughes v. Rader, 183 Mo. 630; Crowson v. Crowson, 172 Mo. 691; Porter v. Jones, 12 L. R. A. 161; Weston v. Hanson, 212 Mo. 248; Maddox v. Maddox, 114 Mo. 35; Wood v. Carpenter, 166 Mo. 465. (6) Even though a hard and confirmed drinker, frequently or even constantly intoxicated, yet if at a par-

ticular time in question he was sufficiently free from the influence of liquor to know clearly what he was about and to otherwise satisfy the usual tests, proof of his habits would not invalidate the will. Chaplin on Wills, pp. 20-21; Peck v. Cary, 27 N. Y. 9; In re Lewis' Estate, 140 Pa. St. 179; Lee's Case, 46 N. J. Eq. 193; Elkinton v. Brick, 46 N. J. Eq. 154; Appeal of Harmony Lodge, 127 Pa. St. 269; Frost v. Wheeler, 43 N. J. Eq. 573; In re Peck's Will, 17 N. Y. Sup. 248; Von de Veld v. Judy, 143 Mo. 348; Schierbaum v. Schemme, 157 Mo. 1; Pierce v. Pierce, 38 Mich. 412; 28 Am. and Eng. Ency. Law (2 Ed.), pp. 85 and 86. (7) There is no presumption of perpetual intoxication and consequent permanent deprivation of reason, and no such presumption arises from proof of frequent or habitual or excessive use of liquors. No one is intoxicated all the time, and he who alleges incompetency from such cause must prove that the testator was in fact so at the very time the will was made. Chaplin on Wills, p. 21; Ayrey v. Hill, 2 Add. 206; Andress v. Weller, 2 Green Ch. (N. J.) 608; Lee's Case, 46 N. J. Eq. 193; Von de Veld v. Judy, 143 Mo. 348. (8) It devolves upon the party alleging a delusion to prove the existence thereof and to show such existence at the time of the making of the will and that the will is the product thereof. It must appear that the testator was subject to a delusion as to facts within his own observation and the existence of which he actually believed, which a rational mind from the use of his senses under the same circumstances would have known not to exist, and the delusion must have been not only the inducing cause, but an existing one at the time the will was made. Knapp v. Trust Co., 199 Mo. 660; Cutler v. Zollinger, 117 Mo. 92; Benoist v. Murrin, 58 Mo. 307; Appeal of Kimberly, 37 L. R. A. 261, 68 Conn. 428; Young v. Miller, 145 Ind. 652; Jones v. Collins, 94 Md. 403; Lee v. Scudder, 31 N. J. Eq. 633; Mullins v. Cottrell, 41 Miss. 291; Edwards v. Davis, 11 Ohio Dec.

876; 28 Am. and Eng. Ency. Law (2 Ed.), p. 96.   (9) If the alleged delusion arose merely when drinking, the ground for assuming continuation fails and it must be affirmatively proved to have existed at the time of the making of the will.  Von de Veld v. Judy, 143 Mo. 348; Chaplin on Wills, p. 21; Hix v. Whittemore, 4 Met. 545; Townsend v. Townsend, 7 Gill (Md.) 10; Stables v. Wellington, 58 Me. 453; Blake v. Rourke, 74 Ia. 519; Brown v. Word, 53 Md. 396.

*John E. Burden* and *Clarence Vivion* for respondent.

(1)  Testamentary capacity means that the testator, at the time of the execution of his will, should have sufficient understanding and intelligence to transact his ordinary business affairs and to understand the nature and character of his property, and the persons to whom he is giving it.  Knapp v. Trust Co., 199 Mo. 640.  ''The marked change in his social and business habits, mind and love and devotion for his children, are strong evidences of unsound mind.''  Holton v. Cochran, 208 Mo. 418; Haviland v. Hayes, 37 N. Y. 25.  Incapacity to make a will may be inferred by the jury from facts anterior and subsequent to its execution, where there is no evidence of such infirmity at the time of execution, and the subscribing witnesses are uncontradicted.  Irish v. Smith, 8 Serg. & Rawle 573; 11 Am. Dec. 648.  The court or jury trying the case must, upon the whole evidence, be satisfied that the testator was of sound mind; so that, if there be inevitable doubt left on this point from all the testimony, the will cannot be considered as proved.  Norton v. Paxton, 110 Mo. 462. Direct proof of a single act manifesting insanity is of far more convincing weight to establish the mental disease than any number of interviews or observations, in which no such manifestation appears, can be to show the contrary.  Bishop v. Hunt, 24 Mo. App. 376.

There is a point at which repulsion and aversion are of themselves evidence of unsound mind. And there is a limit beyond which one feels that it ceases to be a question of harsh, unreasonable judgment of character, and that the repulsion which a parent exhibits toward one or more of his children must proceed from some mental defect in himself. It is so contrary to the whole current of human nature that a man should not only form a harsh judgment of his child, but that he should put that into practice, so as to do the child injury or deprive it of advantages which most men desire to confer upon their children. People v. Hubert, 63 Am. St. Rep. 89-90 (and notes). (2) (a) The correct principle is, that whenever a person imagines something extravagant to exist, which really has no existence whatever, and he is incapable of being reasoned out of his false belief, he is in that respect insane; and if his delusion relates to his act, he is then incapable of making a will. Benoist v. Murrin, 58 Mo. 323; Knapp v. Trust Co., 199 Mo. 640; Holton v. Cochran, 208 Mo. 314. (b) If a person persistently believes supposed facts which have no existence except in his perverted imagination, and are against all evidence and probability, he is so far as they are concerned under an insane delusion. If such delusion relate to persons who at the time would naturally have been the objects of his testamentary bounty, and the court or. jury can see that the disposing provisions of the will, were, or may have been caused or affected by the delusions, the instrument is not his will and cannot be sustained. Shaw's Will, 2 Redf. (N. Y.) 107; Seamen's Friend Society v. Hopper, 33 N. Y. 619. (c) The will of a person affected by insane delusions ought not to be admitted, if he has disinherited his family without cause or looked on his relations as enemies—has accused them of seeking to poison him or the like; in all such cases where the delusion exercises a fatal influence on the acts of the person affected, the condition

of the testamentary power fails, the will of the party is no longer under the guidance of reason, and it becomes the creature of the insane delusion.    Shaw's Will, 2 Redf. (N. Y.) 107; People v. Hubert, 63 Am. St. Rep. 96 (notes); Thomas v. Carter, 170 Pa. St. 272, 50 Am. St. Rep. 770.    (d)    Partial insanity renders a will null and void, if it can be inferred that the will is founded on such partial insanity.    It is only by effects that we can judge of the existence of the exciting cause, and if he be under a delusion, though there be but a partial insanity, yet if it be in relation to the act in question, it will defeat a will which is the direct offspring of that partial insanity.    Benoist v. Murrin, 58 Mo. 324.    (e)    Where the existence of the delusion is shown, and where from it the inference is reasonable, that it did or might have dominated the testator in making his will, the question must be submitted to the jury, whether it did or did not, and they should be instructed that their finding should be against the will if they believe it to be the fruit of the insane delusion.    People v. Hubert, 63 Am. St. Rep. 108.    (f)    The insane may conceal the delusion.   Bishop v. Hunt, 24 Mo. App. 376; Cleavenger, Med. Jur., Insanity, pp. 22-69-70; Ray, Med. Jur., Insanity, sec. 181.    (g)    Where the delusion is as to the legitimacy of a child, and aversion towards the child follows, and the will disinherits the child, the probability and conclusion is that the will is the fruit of the delusion.    People v. Hubert, 63 Am. St. Rep. 96 (notes); Cotton v. Ulmer, 45 Ala. 378.    (h)    Delusion and insanity are convertible terms.    Delusion is the test of insanity. Where delusion is once shown to exist it is presumed to continue and the burden is on the proponent to show that delusion did not exist at the factum.    Cleavenger, Med. Jur., Insanity, p. 282, sec. 6; pp. 257-486-488; Fowlis v. Davidson, 6 Notes of Cases 461; Thornton v. Appleton, 29 Me. 298; Jenakes v. Smithfield, 2 R. I. 255; Shaw's Will, 2 Redf. 126; Seamen's Friend So-

ciety v. Hopper, 33 N. Y. 619; Jerry v. Townsend, 9 Md. 145. (3) The proceeding under the statute to contest the validity of a will being a proceeding at law, this court will not go into the question of the weight of evidence. Appleby v. Brock, 76 Mo. 314; Moore v. McNulty, 164 Mo. 119; Roberts v. Bartlett, 190 Mo. 680. The jury are the judges of the credibility of the witnesses, although they may have made contradictory statements. Lamb v. Railroad, 147 Mo. 171; State v. Tate, 156 Mo. 119; State v. Nolle, 96 Mo. App. 524; State v. McKenzie, 177 Mo. 717.

FOX, J.—This action was instituted by respondent, Elizabeth E. Buford, in the Lafayette Circuit Court, on June 21, 1904, against Robert Gustav Gruber and Casper William Gruber, minors, and Walter B. Waddell and John Chamberlain, executors, having as its purpose the contest of the last will and testament of Gustav Gruber, the father of Elizabeth E. Buford, Robert Gustav Gruber and Casper William Gruber.

It is charged in the petition filed by respondent that Gustav Gruber, on the 14th day of October, 1903, in form did sign a paper writing purporting to be his last will and testament, by which he gave to respondent, Elizabeth E. Buford, his daughter, one dollar, and to his two minor sons, Robert Gustav Gruber and Casper William Gruber, all the remainder of his estate. It was further alleged that at the time of making his will Gruber was, and for a long time prior thereto had been, afflicted with dipsomania, which had destroyed his mind and memory; that he was subject to and labored under the insane delusions that his daughter, the respondent, was not his child, and that his wife was unfaithful to her marriage vow. It is further alleged that the will in question was not executed by Gruber in sound mind and disposing memory, but that at the time of its execution and for a

long time prior thereto, he was mentally incapable of making same and was devoid of testamentary capacity on account of said disease and said insane delusions, which insane delusions operated upon and controlled his mind and induced him to sign said paper and thereby to attempt to disinherit the respondent.

On the issue presented by the pleadings two trials were had. At both trials a jury found the paper writing proposed not to be the last will of Gustav Gruber. The first verdict was set aside by the learned trial judge because it was against the weight of the evidence, and the controlling question now before this court is whether the second verdict can be sustained.

As demonstrated by the instructions given, the only question submitted to the jury was whether or not at the time of the excution of the will in question, Gruber, the testator, was laboring under the insane delusion that his daughter was not his child and that his disinheritance of her was the result solely of such delusion.

Proponents having interposed proper demurrers at the close of respondent's evidence, as well as at the close of all the evidence, and having saved proper exceptions to the action of the court in overruling said demurrers, it devolves upon this court to critically examine the evidence with a view of determining whether or not either of such demurrers should have been sustained. This will involve an extended statement of the facts.

Gustav Gruber married Mary M. Boulware, at Lexington, Missouri, sometime in 1880. Their married life was spent at that place. Gruber was in the insurance business and was quite successful. At the time of his death his property amounted in value to about fifteen thousand dollars. In 1884 the respondent, Elizabeth E. Buford (*nee* Gruber), was born. Casper William Gruber, one of the proponents, was born in 1888, and the other proponent, Robert Gustav Gruber,

was born in 1895. Mrs. Gruber died in March, 1901. Up to about the year 1899 the relations of Mr. Gruber's family had been happy. He was prosperous and was affectionately devoted to his wife and children. To the respondent, his daughter, who was known as and called "Bessie" (and who will be so termed hereafter), he was especially devoted, and as between her and his two young boys he was partial to Bessie. Mrs. Gruber was an exemplary lady and had the respect and esteem of all their acquaintances as a refined and virtuous woman and an affectionate wife and mother. But testator had formed the habit of drinking intoxicating liquor and sometime during the year 1899 the habit had developed to such an extent that he became intoxicated nearly every day. At this time and continuing up to the time of the death of Mrs. Gruber in March, 1901, he invaribly returned home in the evening in an intoxicated state. The drinking habit evidently increased and he reached the point where when he returned home in the evening he acted like a maniac, cursed, swore, whooped, yelled, tried to imitate the voices of beasts, and, as the testimony shows, formed, without a reason, an intense aversion to his wife and his daughter Bessie. About eighteen months or two years before Mrs. Gruber died he became impressed with the notion that his wife had been untrue to him and that Bessie was not his child. This notion gradually formed in his mind as a fixed conviction, which his wife and others were unable to reason away. In the presence of his wife he would tell Bessie that she was not his child and he would tell his wife that Bessie was not his daughter. He would make these charges both when he was drunk and when he was sober, in the morning, at noon and in the evening, and continued to do so almost daily up to the time of Mrs. Gruber's death. When Mrs. Gruber protested and remonstrated with him and tried to reason him out of his unfounded delusion he became very much excited, flew

into a passion, raved and uttered oaths and impreca-
tions. There is no question and it is conceded that
Mrs. Gruber was a virtuous lady and a loyal, devoted
and dutiful wife. It is further conceded that Bessie
was his daughter and that there was no reason or
foundation for the belief or delusion that she was not.
Mr. Gruber's habits of drinking and his intense aver-
sion to Bessie continued to increase up to the time
of the death of Mrs. Gruber. In the meantime Gruber
was attending to his business which he contiuned to
manage fairly well, although it fell off considerably
on account of his intemperate habits. He kept bank
and other accounts correctly. In short, the evidence
shows that he continued to conduct his insurance busi-
ness, but not with the same push and success as he had
prior thereto.

Mrs. Gruber died early in the evening. Gruber
had been gone that day as usual to his office. He came
home shortly before her death. The scene that oc-
curred at the death bed beggars description. He
would not believe that she was dying, but insisted that
she was hungry and forced potted ham into her mouth.
After her death a few moments later he poured raw
whisky into her mouth, claiming that she was not
dead and that he possessed the hypnotic power to re-
store her to health. When the neighbor ladies who
were present protested, he threatened to throw them
out and became almost violent.

After the death of Mrs. Gruber, Bessie, who was
then seventeen years old, took charge as Mr. Gru-
ber's housekeeper and assumed the motherhood of her
two little brothers. She was fondly devoted to them
both and especially Robert, who was then only about
six years old. She did all the cooking, mending, sew-
ing and other house work for her father and broth-
ers. But Mr. Gruber's habits of becoming intoxicated
continued after his wife's death. His attitude towards

223 Sup—16

Bessie did not change. He still harbored in his mind the conviction that she was not his child, repeatedly told her so, and sometime during the summer of 1901 he drove her from his house, telling her that she was not his child and he did not want her there. He began before the death of his wife, and kept it up after her death, to tell Bessie that she would not get any of his property because she was not his child, and when Casper, her brother, remonstrated with him he became very angry and acted like a maniac, tearing his hair, wildly demonstrating, etc. Sometime after driving Bessie from home in the summer of 1901 he sent for her and had her come home. He treated her nicely for a few days and then began to treat her as before, only worse. He accused her of trying to poison him, would go into her room at night and abuse her while she lay in bed, order her not to lock her door, continued almost daily to tell her that she was not his daughter, that she would not get any of his property and would refuse to drink the coffee she made or eat the victuals she cooked. This conduct on his part continued until January 1, 1902. When, on his return that evening from his office, he found her preparing the evening meal, he threw his meat, cakes and other things Bessie was cooking out, and drove her away into a very cold night, without wraps and without a home to go to, ordering her never to return, and telling her at the time she was not his daughter and that he would see that she had trouble in getting any of his property. She never returned, but on the 9th of February, 1902, she was married to Mr. Buford. She met her father one time after that in Lexington, and when she spoke to him and addressed him as father, he denounced her as no daughter of his and refused to have anything to do with her.

The foregoing facts were testified to by the respondent, Elizabeth E. Buford, known as Bessie, one of the proponents, Casper, her brother, Belle Lewis

and Hub Hayden, a couple of negro tenants who lived in the yard of Mr. Gruber and who were about the house every day, and George Parks, a neighbor. These persons saw more of Mr. Gruber, especially during the time he was drinking, than did the other witnesses who testified in the case.

After Bessie left home on January 1, 1902, Mr. Gruber made arrangements for his boys and placed them in school. He took up his living quarters in rooms adjoining his office. On the 14th day of October, 1903, Gustav Gruber made and executed a will, in the presence of J. Q. Plattenburg, Henry C. Wallace and D. W. B. Tevis, as witnesses, which will, omitting formal parts, is as follows:

"Item 1st. After the payments of my debts, including burial expenses, I do dispose of my property, both real and personal, in the following manner:

"To my daughter, Bessie E. Buford, I bequeath one dollar and direct my executors to pay such sum of one dollar to her in full, of her share of my estate.

"To my sons, Casper William Gruber and Robert Gustav Gruber, I bequeath all the rest and residue of my property and estate, both real and personal.

"Item 2nd. I hereby nominate, constitute and appoint Walter B. Waddell and John Chamberlain as executors of this, my last will and testament."

At the time of executing his will testator was about fifty-five years old. After its execution he continued to use intoxicating liquor to a greater excess than before. He died in a hospital in Kansas City, Missouri, on April 5, 1904, presumably from the effects of the excessive use of intoxicating liquors.

Shortly after making the will, Gruber, upon becoming dissatisfied with the manner in which his son was sweeping out his room, told him that he was sweeping the same as Bessie did and was trying to run him out, then remarked, "I have her fixed now; I have made my will and cut her out. She is not my child and

I have got everything settled." Casper's testimony was that continuing on up to a few days before his death, or the last time he saw him, whenever Bessie's name was mentioned he would fly into a passion and declare that she was not his daughter and that he was not going to give her any of his property. He made these statements to Casper before he went to Kansas City, and a few days afterward died.

George Parks, a neighbor, testified that he heard Gruber at home cursing, swearing and apparently abusing his family. That Gruber talked to him about Bessie before and after she left, and stated that he was not going to give her anything; that she was not straight and was not his child.

Both Hub Hayden and Belle Lewis testified about the conduct and drinking habits of Gruber and his treatment of his family, especially his wife and daughter Bessie. Belle Lewis, a negro woman, who did the washing for the Gruber family and was at the house considerably, heard Gruber on many occasions before Mrs. Gruber died, tell her, Mrs. Gruber, that Bessie was not his daughter and that he did not intend to leave her any of his property. Also after the death of Mrs. Gruber she testified that she heard Gruber tell Bessie she was not his child and that she would never get anything; that he became infuriated about Bessie's cooking, would throw the meat and vessels out the door and accuse Bessie of trying to poison him.

Casper Gruber, one of the proponents and brother of Bessie, also testified fully and freely about the conduct of his father, his drinking habits and his numerous denials of Bessie being his daughter, both before and after the death of Mrs. Gruber, and after Bessie left her home in January, 1902, as well as the numerous declarations that she would get none of his property.

It was shown that after the death of Mrs. Gruber, Bessie desired to attend school and take music lessons,

but that her father would not allow her to do so. Several of her friends, especially lady school teachers, intervened and tried to induce him to let her go to school. He would promise to do so but afterward would not allow her.

Altogether respondent introduced thirty-three witnesses, and outside of those above referred to, who knew most about his home and domestic life and of his treatment of his wife and Bessie, the other witnesses were his social friends and business associates, and they testified in a general way of his excessive habit of drinking. That during the latter part of his life he transacted but little business and was intoxicated most of the time. He was inclined to stand upon the streets and did not appear to want to talk with anyone, was quiet and morose; when he did talk his conversation was not connected and usually had no point to it. His condition from May to November, 1903, is best described by Robert Hicklin, an attorney at law, who had offices near the office of Mr. Gruber in the Commercial Bank Building at Lexington, from the spring of 1903 to November of that year. He says that he had known Mr. Gruber and that they had been friends for a long time before, and that previously he had been a quiet, successful business man; during 1903 when Mr. Hicklin would be in town he would be with Mr. Gruber more or less every day and converse with him; he stated that a decided change had come over him for the worse; that his health had become seriously impaired and broken down and that he was under the influence of liquor all the time; that he never saw him sober during the year 1903; says that Gruber did not converse anything at all as he did formerly; that he was of a retiring manner when he was not under the influence of whiskey; that he was formerly a quiet, gentlemanly man. When witness officed near him last time he would talk and undertake to engage in conversation, but there was absolutely nothing to his con-

versation; his talk was silly and disconnected, no point to it. This witness, together with some ten or twelve others, after describing his excessive drinking, his appearance and conduct, were of the opinion that he was not a man of sound mind. On cross-examination this witness says that he apparently was a man broken down by excessive use of liquor.

The defendant introduced the subscribing witnesses to the will, who testified that Mr. Gruber signed the will in their presence, declaring it to be his last will and testament, and that he was of sound mind at the time, so far as they observed. Mr. Wallace, the attorney who wrote the will, in describing the circumstances under which the will was written, said: "He came in and said he was ready to have his will made. I drew it on the typewriter. I put the paper in the machine and began to write and asked him what he wanted in the will, how he wanted it to be made and he said he wanted his debts paid and that he wanted to give his property to his two little boys, Robert and Casper. That he did not want Bessie to have any of his property and he only intended to give her one dollar; that he wanted it put in that way, that she was to have a dollar of his estate. He said the reason he was not going to give her anything was because she had run away and married against his will." Mr. Wallace says that Mr. Gruber selected the executors, who were leading business men of Lexington.

The testimony of numerous leading business men of Lexington, among whom were presidents and cashiers of banks, school teachers, merchants, lawyers, druggists, etc., tended to show that Mr. Gruber, especially during his early married life, was an excellent business man, a fine penman and a man who kept his books in excellent shape and attended strictly to his business. While most of these witnesses concede that in his latter life he became addicted to excessive drinking and was very often intoxicated and unfit for busi-

ness, yet his accounts with banks and merchants and other business men were correctly kept, and that he had no business trouble of serious consequence. Nearly all of these witnesses were of the opinion that he was a man of sound mind and well fitted for business when he was not drinking. Some evidence introduced tended to show the declarations of Mr. Gruber that he disinherited his daughter because she was disobedient, would not go to school and married against his wishes; on the other hand, the recorder to whom the application was made for the license when Bessie was married, called upon Mr. Gruber for his consent and he neither gave nor withheld his consent, but expressed himself that he did not care what she did nor whom she married.

As this cause must eventually be determined upon the question as to whether or not there was evidence tending to show that testator, at the time of executing his will, was laboring under the insane delusion that Bessie was not his child and that such delusion prompted him to disinherit her, the above statement of facts sufficiently presents the record of the trial of this cause.

At the close of the evidence the court instructed the jury upon every phase of the case to which the testimony was applicable. We do not deem it essential to reproduce the instructions given, but will during the course of the opinion give them such attention as we deem necessary. The cause was then submitted to the jury and they returned their verdict as heretofore indicated, finding that the paper writing propounded as the last will of Gustave Gruber, deceased, was not the will of said Gustav Gruber, deceased.

Timely motions for new trial and in arrest of judgment were filed and by the court taken up and overruled. From the judgment entered in conformity to the verdict as returned by the jury the defendants in due time and proper form prosecuted this appeal

to this court, and the record is now before us for consideration.

## OPINION.

### I.

The record discloses numerous objections and exceptions to the admission and rejection of testimony during the progress of the trial. The record in this cause is quite voluminous, embracing five or six hundred pages; however, we have examined in detail the preservation of the objections and exceptions to the admission and rejection of testimony and in our opinion the testimony as offered and introduced, to which objections were made, had a tendency to at least throw some light upon the issue presented by the pleadings, and the ruling upon that proposition must be adverse to the appellants.

### II.

This brings us to the consideration of the instructions given in this cause. Three instructions were given for plaintiff and nine for the defendants. Due exceptions were saved by defendants at the time to the giving of plaintiff's instructions. In substance, the court instructed on the part of plaintiff, that an insane delusion is a conception originating spontaneously in the mind, without evidence of any kind to support it, which can be accounted for on no reasonable hypothesis, having no foundation in reality and springing from disease or a morbid condition of the mind, and the person laboring under same cannot be reasoned out of such conception; that whenever a person imagines something extravagant to exist which really has no existence whatever, and he is incapable of being reasoned out of his false belief, he is in that respect insane; that if the delusion relates to his child and the jury further believe that plaintiff was the child of Gustav Gruber, that he imagined that she was not his child, that there was no reason or foundation in fact for such conception, and that he was incapable of

being reasoned out of same, then said Gruber was possessed of an insane delusion as to his said child; that if the jury believed from the evidence that said will was the fruit or offspring of such delusion or false conception, then they would find for plaintiff, although they might believe that said Gruber was sane and rational upon other subjects and capable of transacting ordinary business. Again, that if the jury believed from the evidence at the time said Gruber executed the will he was laboring under an insane delusion as defined in the instructions and that such delusion affected the disposition of his property in regard to the plaintiff, and that it was the offspring or fruit of such delusion, then he was at the time without testamentary capacity.

At the request of the defendants the jury were instructed in substance, that if they believed from the evidence that at the very time Gruber signed said will he had sufficient understanding and intelligence to, and did know that he was disposing of his property by will, and the disposition he was making of his property and to whom he was giving it, then he had sufficient mental capacity to make a will, and the finding would be for defendants, unless the plaintiff had shown by a preponderance of the evidence that at the very moment he executed the will he was laboring under the insane delusion that plaintiff was not his child, and that solely by reason of such delusion and belief at the very moment he signed such instrument and for no other reason, he did not give the plaintiff the portion of his estate he otherwise would have given her. The jury were further instructed that although they might find that Gruber possessed said insane delusion about his child when he was under the influence of intoxicating liquor, yet this would not be sufficient and they must further find that he entertained such delusion when sober and that his will was the fruit or offspring of such delusion.

The determination of the correctness of the instructions will depend upon the state of the law concerning delusions or partial insanity. "A delusion, which might incapacitate a person from making a will is the conception of the existence of something extravagant which has no existence whatever, but of which the person entertaining it is incapable of becoming permanently disabused by argument, reason or proof. . . . All delusions are not insane delusions. The difference between the two species is that one is the product of the reason and the other a figment of the imagination. Thus, on an issue as to the insanity of testator, the question is not whether a certain view of his was sound, but whether he imagined or conceived something to exist which did not in fact exist, and which no rational person, in the absence of evidence, would have believed to have existed. . . . In order that a testator may comprehend the relations which he holds to those having claims upon him, no insane delusion should influence his will. Unreasonable prejudice against relatives is not ordinarily a ground for invalidating a will, but it may be set aside where the testator's aversion is the result of an insane delusion, and his conduct cannot be explained on any other ground." [2 Words and Phrases, pp. 1971-2-3.]

"And to invalidate a will it must appear that the testator was subject to a delusion, as to the facts within his own observation, in the existence of which he actually believed, which a rational man, from the use of his senses, under the same circumstances, would have known not to exist. To invalidate a will a delusion upon the part of the testator must have been not only the inducing cause of it, but also an existing one at the time the will was made." [Knapp v. Trust Co., 199 Mo. l. c. 668.]

Insanity in the form of a delusion was exhaustively treated by Judge WAGNER in the case of Benoist v. Murrin, 58 Mo. 307. The conclusion reached by Judge

WAGNER, after an examination of the authorities, was that "the correct principle is, that whenever a person imagines something extravagant to exist which really has no existence whatever, and he is incapable of being reasoned out of his false belief, he is in that respect insane; and if his delusion relates to his property, he is then incapable of making a will." The case of Benoist v. Murrin has been followed and repeatedly affirmed by a long line of decisions in this State. The principle is also recognized in that case that a man may have excellent business capacity, manage his estate with skill and vigilance, and yet be incapable of making a will by reason of an insane delusion possessed by him which relates to and controls the disposition of his property.

Insanity, such as will render a person incapable of making a will, may be general or it may be partial. It may be termed monomania or a delusion, but the authorities agree in holding, as embodied in the instructions given in this cause, that where a person imagines something extravagant to exist which really has no existence whatever, and he is incapable of being reasoned out of his false belief, he is in that respect insane, and if his delusion relates to his child and he imagines, believes or conceives that she is not his child, when there is no foundation for such conception, and being incapable of being reasoned out of same, then the testator would be possessed of an insane delusion as to his child, and if the will made is found to be the fruit or offspring of such false conception, then the jury may be warranted in finding against the paper writing proposed by proponents, although it may develop that the testator was sane and rational on other subjects and capable of transacting ordinary business.

The above principles seem to be well established as the law of this State, and so holding we are of the opinion that the instructions, taken as a whole, were fair and liberal to defendants, and clearly and tersely

presented the law as applicable to the facts of this case. We are therefore fully convinced that the objections urged by appellants to the instructions given by the court are not well taken, therefore the action of the trial court in this respect must be sustained.

### III.

Having found that the trial court committed no reversible error in the admission and rejection of testimony and in the declarations of law given the jury, we are now confronted with the proposition as to the sufficiency of the evidence developed upon the trial to authorize the submission of the cause to the jury.

This being an action at law the same rule applies as in other actions. If the evidence is conflicting this court will not undertake to reconcile it. If there is any competent evidence tending to show the insanity of Mr. Gruber in that he possessed an insane delusion that his daughter was not his child, and that the will in question was the fruit or offspring of such delusion, this court cannot disturb the verdict of the jury by undertaking to say that they placed an improper estimate upon the weight of evidence. [Knapp v. Trust Co., 199 Mo. l. c. 668, and authorities there cited.]

Therefore, the only question remaining for this court to determine is whether or not there is sufficient evidence disclosed by the record to authorize the submission of the cause to the jury by the trial court and to give support to the action of the court in overruling defendants' demurrer interposed at the close of respondent's testimony, as well as that asked at the close of all the testimony.

It will be observed that the testimony in this case took a wide range. It began with the marrige of the testator to his wife in about the year 1880. It disclosed their family relations, especially the treatment of his family by Mr. Gruber from the time his first child, Bes-

sie, was born, up to the time of the death of Mrs. Gruber in March, 1901, and continuing with that time up to the time of the death of Mr. Gruber in the early spring of 1904. His business habits as well as his social relations were gone into from the time of his marriage to the time of his death. Such latitude of investigation was proper and was justified under the law.

Where a charge of insanity is made against a testator evidence is competent to show the condition of his mind long prior to and closely approaching the time of the execution of the will, as well as the condition of his mind shortly subsequent to its execution. The purpose of such testimony is to indicate the state of his mind at the very time of the execution of the will. The condition of his mind is tried as of that time. All such evidence is receivable for the purpose of indicating to the jury whether or not the testator at the time the will was executed had sufficient mental capacity to fill the requirements of the law. [Von De Veld v. Judy, 143 Mo. l. c. 363; Knapp v. Trust Co., 199 Mo. 640; Holton v. Cochran, 208 Mo. l. c. 426.]

After carefully analyzing in detail the whole record of the evidence in this case, we have come to the conclusion that the verdict rendered by the jury ought to be sustained for the following reasons:

From about the year 1880, when Mr. Gruber married, up to about 1899, he lived a happy life with his wife and children; he had a prosperous business and accumulated property; he was affectionately devoted to his family and the respondent, Bessie, was his favorite. The family stood high in the community where they lived and there was never a breath of suspicion so far as the evidence shows against the marital loyalty of Mrs. Gruber. Sometime, presumably after the birth of his children, Mr. Gruber began drinking and the habit grew upon him until it reached an excessive state. He then began regularly to come home in the

evening from his office work in a state of intoxication, grew irritable, cross and fault-finding with his family, and especially Mrs. Gruber and his daughter Bessie. About this time, without any reason whatever, so far as the evidence discloses, he conceived the false belief that Bessie was not his child, and, by innuendo at least, accused his wife of not being true to her marriage vows. The witnesses describe the first time that he made the charge that Bessie was not his child; he then continued nearly every day to make the same charge, and evidently formed a great aversion to his daughter Bessie. So far as the evidence shows he never after that treated her kindly and as a daughter. Mrs. Gruber remonstrated and reasoned with him and so did his children and the old colored woman who lived in the yard, but instead of listening to them he became insanely angry and raved like a madman. This conduct continued up to the time of the death of Mrs. Gruber in March, 1901. There is no doubt but that his habits of intoxication and his treatment of his wife and daughter hastened her death. After the death of Mrs. Gruber, passing by his unnatural conduct which occurred at her death bed, he continued to keep up his excessive habits of drinking and intoxication and his treatment of his daughter Bessie, instead of improving, grew worse and he continued repeatedly and often to accuse her of not being his daughter, and to tell her that she would not get any of his property. The evidence shows that Bessie was dutiful and obedient to her father and very solicitous for his welfare; that she kept house for Mr. Gruber and her two little brothers; that she was very much devoted to her brothers and did all for them and her father she possibly could. There is no evidence showing that she was rebellious or disobedient or that she refused to go to school, outside of one or two indefinite statements that should have been made by Mr. Gruber. In the summer of 1901, without any cause, so far as disclosed by the evi-

dence, Mr. Gruber drove Bessie away from his house, telling her that she was not his child and to leave his home. Afterward, upon being sent for by him, she returned and remained with him until January 1, 1902, but his intemperate habits continued, his treatment of Bessie was the same as before; he insisted that she was not his child and that he would not leave her any property, although she and her brothers, especially the older one, Casper, tried to convince him to the contrary. Their home life with Bessie as housekeeper and foster mother of her brothers terminated and ended on January 1, 1902, when he drove her from his house on a cold night, admonishing her never to return or to darken his door again, with curses and imprecations and charging her that she was not his daughter and he would give her none of his property, at the same time telling her to go and get married if she wanted to. The following month she was married to Mr. Buford, her present husband. Bessie saw her father only once after that. Sometime during 1903, in the spring of the year, she met her father in Lexington; he refused to recognize her as his daughter, told her that she was not his child, and refused to have a conversation with her.

The foregoing outline of facts were testified to by those who were close to him and saw him every day, and who were in the most favorable position and had the best opportunity of knowing and observing his conduct and actions. Appellants introduced quite a number of witnesses—business men of good standing— who occasionally had business transactions with Mr. Gruber, who testified to his good business qualifications and that, so far as they had observed, he was a man of sound mind. They had no opportunity to observe his conduct at home and his treatment of his wife and daughter. Possibly Mr. Hicklin was closer to Mr. Gruber and saw more of him from the spring of 1903 to November, 1903, than any other person, ex-

cept the sons of Mr. Gruber. He says that he was drunk about all the time, but while he was talkative he could not carry on a connected conversation, and there was no point to anything he said. Mr. Hicklin officed near him and saw him every day and had a better opportunity of observing his conduct during that time than any other outside witnesses who testified.

It is well to note the circumstances under which the will was made. It will be observed that the provisions of the will made no change in the statutory devolution of the property, except to disinherit his daughter. It is quite evident that the only object he had in making the will was to deprive Bessie of any benefit of his estate. It will also be observed from the testimony of Mr. Wallace, who wrote the will, that while he spoke of Robert and Casper as his two boys, he spoke of Mrs. Buford as Bessie and did not use the word daughter, telling Mr. Wallace that he did not want Bessie to have any of his property; that he only intended to give her one dollar and that he wanted it put in that way. While it is true that he did not tell Mr. Wallace that he was disinheriting Bessie because she was not his daughter, yet it is difficult, in view of all the facts proven, to conceive how the jury came to any other conclusion than that at the time of making the will he entertained the false belief and delusion that Bessie was not his daughter, and that he was impelled by that false notion to execute the will. At least we are of the opinion that the jury was justified in reaching that conclusion by the evidence offered. There can be no question but that for a time extending from about the year 1899 to January 1, 1902, Mr. Gruber entertained the fixed and false belief that Bessie was not his child, and that there was ample evidence to justify the characterization of such belief as monomania or an insane delusion.

It is said in the case of State v. Lowe, 93 Mo. 547, that "the rule of law, as I understand it to be, is, that

where insanity is the result of some temporary cause, as a fit of sickness or the like, then no presumptions of continuity flow from such temporary cause; but, on the other hand, when you establish, as the evidence tended to do in this case, an insane condition of mind, existing and exhibiting its peculiarities for a long period of years, I incline to think that an instruction embodying the principle evidently intended to be contained in the one asked should have been given. . . . This habitual . . . state of insanity being shown to exist, its continued existence will be presumed, and the burden of establishing a subsequent lucid interval at the time of the act, either civil or criminal, being done, lies on him who asserts it.''

In State v. Wilner, 40 Wis. 304, where the circumstances tended to show insanity or delusion, it was held error to refuse an instruction which embodied the idea of the presumption of continuance of such delusion.

. In the case at bar the insane delusion having been shown to exist, taken in connection with the conduct of Mr. Gruber during the years 1902 and 1903, especially the condition of his mind growing out of his habit of the excessive use of intoxicating liquor, as well as the facts surrounding the execution of the will, we think warranted the jury in finding that at the time and at the very moment when the will was executed Mr. Gruber was laboring under the insane delusion that respondent was not his child, and that the will in question was the fruit or offspring of such delusion. So holding that the verdict rendered by the jury in this cause finding that the paper writing propounded as the last will and testament of Gustav Gruber was not his will, was justified by the evidence, and that the trial court acted correctly by submitting the cause to the jury upon proper instructions, the judgment of the trial court setting aside the will of Gustav Gruber, deceased, is affirmed, and it is so ordered.

All concur.