WALTER GAUME, Appellant, v. LAURA GAUME.—102 S. W. (2d) 636.

Division Two, March 11, 1937.

*John P. Peters, E. M. Zeverly, Irwin & Bushman* and *Harry L. Buchanan* for appellant.

*Garstang & Garstang, Hutchison & Hutchison* and *James Booth* for respondent.

COOLEY, C.—This is a statutory action to contest the will of Ed Gaume. The case comes to the writer on reassignment. At the close of the plaintiff's evidence the court directed a verdict sustaining the will and from judgment thereon the plaintiff appealed.

Ed Gaume died about May 20, 1932, leaving surviving him one son, the plaintiff herein, and a widow, Laura, the defendant, mother of plaintiff. The will in question was executed August 20, 1931. By said will the testator gave $5 to his said son and the remainder of his property to said Laura, whom he named as executrix, referring to them respectively as his "beloved son" and "beloved wife." Some two or three years prior to the execution of this will the testator had made a will exactly like the last one except for the date and the names of the witnesses. The witnesses to that will had died and the new will was executed for that reason, in order to obviate supposed possible difficulty in probating.

The petition charges that the purported will is not Ed Gaume's will because "the said Ed Gaume at and prior to the making of said purported will was subject to and labored under the insane delusion that all children were a curse and a misfortune to their parents rather than a blessing, and especially that his son, Walter Gaume, although

he was a dutiful son, obedient and respectful, was a great misfortune in the life of the said Ed Gaume; that the said Ed Gaume constantly felt and many times expressed a regret that a child should have been born to him, and formed without reason, an insane aversion to his son, the plaintiff; that at the time of the making of said purported will and for a long time prior thereto the said Ed Gaume was afflicted with dipsomania which had destroyed his mind and memory. Plaintiff further says that the purported will of Ed Gaume was not executed by said Ed Gaume in sound mind and disposing memory, but that at the time of its execution and for a long time prior thereto said Ed Gaume was mentally incapable of making a will and was devoid of testamentary capacity on account of said disease and said insane delusion, which insane delusion operated upon and controlled his mind and induced him to sign said purported will and thereby to attempt to disinherit the plaintiff. Plaintiff further says that the making and signing of said purported will was procured by the undue influence of the defendant Laura Gaume."

The petition further alleges that said Ed Gaume left an estate, consisting of real and personal property, of the value of about $20,000. There was no evidence, however, showing the value of the estate nor how much, if any, thereof consisted of personal property, nor what debts, if any, testator owed. The evidence showed that he owned a farm of 407 acres in Osage County, upon which he had lived for many years. The character and productivity of the land is not shown. It may be inferred from the evidence that it was not very good for grain growing purposes. It is referred to as "cut-over land." Sprouts and brush kept growing upon it and had to be cut down frequently. It was not used for grain growing, but was devoted to the production of hay and pasturage. Plaintiff was born and reared on this farm.

There was no evidence tending to show that the execution of the will in question was procured by undue influence of Laura Gaume nor that the testator, when he executed the will, was "afflicted with dipsomania," which had destroyed or affected his mind or memory. Also the evidence shows without dispute that testator was a man of strong will and good judgment, a capable business man and a shrewd trader. He was fond of his wife and uniformly kind and considerate toward her. That much is virtually conceded by appellant, wherefore we need not refer to the evidence showing those facts. Neither is it contended, nor can it be, that the testator, at the time of making his will, was not in full possession of his mental faculties, which were good, *unless* said testator was then obsessed by an insane delusion regarding his son, plaintiff herein, which rendered him incompetent to make the will in question. Appellant urges here and relies upon only that proposition, viz., that testator did have such insane delusion. Since the trial court sustained defendant's demurrer to plaintiff's evidence and directed a verdict sustaining the will, the question be-

fore us is, was there any evidence from which a jury could legitimately find that the purported will was the product or resultant of such alleged insane delusion?

The evidence tended to prove that Ed Gaume was habitually a very profane man, given to the use not only of profane language but of opprobrious epithets, especially the term son-of-a-bitch, a characteristic also of his father and brothers, and that he very often cursed his son and called him a son-of-a-bitch or "little son-of-a-bitch;" that he frequently used said epithet in speaking of other persons including his close relatives; that on several occasions he said that plaintiff's birth had been "an accident" and that he would have been better off if plaintiff had never been born; and that on at least one occasion when speaking of children he expressed the view that they are a detriment to their parents rather than a benefit. There was no evidence tending to prove, nor is it contended, that testator ever expressed doubt or suspicion as to plaintiff being his son, or that he ever struck him or otherwise mistreated him except by cursing him when angry and applying to him the epithet above mentioned.

Appellant was a good and dutiful son. There is no evidence that he was ever abusive or disobedient to his father. As he grew up he was required to and did work regularly and industriously on the farm, and in assisting his father in buying and handling cattle, which appears to have been testator's principal business activity. Sometimes he would have to be up early and work late but the evidence does not show that his lot was more onerous or difficult in this respect or his privileges and pleasures fewer than in the case of other boys and young men in that and like communities. He early developed marked ability in judging and buying cattle and was of valuable assistance to his father in that business, of which fact the father on a number of occasions expressed his recognition.

When appellant was about eighteen years old he married, without his parents' knowledge, a neighborhood girl some four years younger than he. This act, however, while a surprise and possibly, according to plaintiff's testimony, something of a disappointment, to testator, does not appear to have occasioned any resentment or change of attitude or feeling on the part of testator or his wife toward plaintiff. Plaintiff brought his young bride to the parental home, where they were kindly received and well treated by Mr. and Mrs. Gaume. They remained there a week or so when they went to Kansas City, where plaintiff worked for small wages for about a month. They then returned to testator's place, apparently at the request of testator and his wife, and after living about a month with plaintiff's parents took up their abode in a house on the farm near that in which the parents lived. Ed Gaume bought and gave to the young couple the furniture for their home—not very costly or elaborate but sufficient for their needs. Plaintiff and his wife lived in that house for about three

years, during which time plaintiff worked about the place and assisted his father in buying and handling cattle as he had previously done.

At some time during this three year period, according to plaintiff's evidence, there appears to have been some sort of agreement entered into between father and son for the buying of cattle in partnership, which, however, did not last long. It seems they disagreed about how checks should be written and it is inferable from plaintiff's testimony that he thought his father was not living up to the agreement as he, plaintiff, understood it. Plaintiff and his wife then left the farm and moved to a town some miles away, where they subsequently resided. It does not appear that the father objected to or expressed resentment at such action on the part of the young couple, or that it caused any change in his feelings toward his son. During the three years plaintiff and his wife thus lived on testator's place plaintiff received no wages or salary from his father but did some "trading" on his own account and accumulated a small amount of property—four or five cows and some sheep and chickens, which he kept on the place. When he became twenty-one years of age his father bought for him and gave him an automobile.

Mrs. Rita Gaume, wife of plaintiff, testified that after her marriage to plaintiff the latter worked on the farm for three years, doing all the work except in haying time, for which he received no pay; that very frequently testator would curse plaintiff and call him a son-of-a-bitch; that plaintiff did not "talk back" or call his father vile names; that testator "drank a lot of beer and whiskey;" that she had never seen him "down drunk" or staggering, but that he was "pretty full sometimes;" that testator proposed to his son that they "go partners" and share profits in buying and handling cattle but the arrangement was short lived because the elder Gaume objected to the way in which his son was writing checks and "cursed Walter" about it, whereupon the arrangement terminated and she and her husband left the place. Her testimony does not indicate that she herself was ever treated otherwise than kindly by Ed Gaume or his wife, or that her husband, the plaintiff, was mistreated except by being cursed and called a son-of-a-bitch by his father and receiving no pay for his time and work.

Plaintiff testified in his own behalf that as a boy he had attended the country school and as he grew up worked on the farm; that from the time he was big enough he did practically all the work except during hay harvest; that his father was not in good health during his later years, complaining of high blood pressure, and did but little, if any, work on the farm; that he, plaintiff, began assisting his father in buying cattle when about twelve years old and continued so to do while he remained on the farm; that his father drank "a lot of beer and whiskey,"—he "never saw him down drunk but when he drank

liquor was when he did most of his raving'' and used the term son-of-a-bitch or little son-of-a-bitch and that from his earliest recollection his father very frequently cursed him and used said epithet toward him. ''Q. What would he curse you about? A. Well, I couldn't say it was about much of anything.'' He testified that he tried to do what his father wanted but it seemed he ''never could do anything to please him;'' that his father never struck him but several times said that his birth ''was an accident or I wouldn't have been there;'' that he never cursed or ''talked back'' to his father. He said that soon after his marriage he and his wife went to Kansas City where he worked for about a month, when his grandmother died and ''they'' wrote him and his wife to come back and requested them to stay, which they did, remaining on the farm about three years, during which time plaintiff worked on the farm and assisted his father in cattle buying, for which he received no pay. It appears from his testimony, however, that during that period he did some trading or buying for himself, accumulating some property, as we have above mentioned, and seemingly some money, though perhaps not much, and that such stock as he had was pastured and maintained on the place.

Plaintiff further testified that his father finally proposed a partnership in the cattle business, each to put up half the money and they to divide the profits, to which he agreed. That arrangement seems to have been made in 1928, when plaintiff was about twenty-two years old. It lasted but a short time. Plaintiff said that he made arrangements with a bank to furnish him his part of the money and had some checks printed with the name ''Gaume & Son'' thereon; that when his father learned thereof he objected to checks being so written, whereupon plaintiff suggested that thereafter ''I will write my part in my name and your part in your name,'' to which the father replied, ''No, sir, I want it written in my name.'' ''He didn't swear any, but he said he didn't want no more wrote like that.'' Q. ''And that ended the partnership, did it?'' A. ''Yes, sir.'' Plaintiff and his wife then left the farm and thereafter resided elsewhere. Plaintiff had ''no words'' with his father when he left the farm. He ''just left.''

While plaintiff and his wife lived on the farm Ed Gaume and his wife would occasionally visit and take meals with them, on which occasions there was no unpleasantness. After plaintiff left the farm he and his father occasionally met. At such times they spoke to each other, apparently, as we gather from plaintiff's testimony, without rancor or bitterness, but the two families did not pay each other visits.

Plaintiff offered no medical or expert witnesses but called nearly a score of lay witnesses. No witness testified that in his or her opinion Ed Gaume was of unsound mind at or prior to the time of executing

the will. Without taking space to set out or summarize the testimony of the various witnesses in detail it may be stated that it tended to show that Ed Gaume was a man of strong will and rather high temper, a man of good mind and of good business judgment, but habitually addicted to the use of profane and vulgar language and the term son-of-a-bitch, a term which he frequently used in referring to various persons, sometimes when angry, sometimes when not angry. Illustrative of this habit we refer to the testimony of one of plaintiff's witnesses, Frank Kaullen, who, on this point testified in substance that he had known Ed Gaume for many years and had known plaintiff ever since he was a small boy; that Ed Gaume was "a kind of a peculiar turned man," he would say son-of-a-bitch or something like that, it was merely a word he used quite often, a byword of his—"I don't think he meant any more by using that word than he did a common word;" that Ed Gaume was really a good man, he was all right; that he was in the habit of swearing a lot but did not appear to mean anything by that or "having anything against anybody when he swore in that manner;" that he never knew Ed Gaume to mistreat the boy (plaintiff); that he would talk about plaintiff and curse him and he would curse that way when he talked about almost anybody; that it was a general characteristic of the Gaume family to talk that way; and that it was Ed Gaume's habit to talk that way—"I knew that his mind wasn't affected, he sort of let it go because he didn't mean anything." Several other witnesses testified to Ed Gaume's inveterate habit of using profane language and the term son-of-a-bitch, and the evidence shows no dispute as to that fact. In this connection it should be stated that the reference by witnesses to the characteristic of the "Gaume family" of using profane and obscene language did not include plaintiff, but applied only to testator and his father and brothers. There was no evidence that plaintiff was addicted to the use of such language. There was testimony tending to show that Ed Gaume at times would call his son or, in speaking of him, would refer to him as, a "little son-of-a-bitch" from the time he was a small child and would sometimes refer to plaintiff's birth as having been "an accident," etc., when the evidence indicates that he was really fond and proud of the boy; that he said to one witness that he did not see why he had to have the little son-of-a-bitch and that he would have been $10,000 better off if plaintiff had never been born; that he said once, speaking of his son and "one thing and another," if he had his time to go over again "such sons-of-bitches couldn't make a track in his yard;" that he frequently used the word "son-of-a-bitch" when he "wasn't mad at all." There was testimony from one witness that Ed Gaume said to him, speaking of "his idea about people having children and whether they were a benefit or a detriment" that they were a detriment. (The time and circumstances of this conversation are not shown.)

. There was testimony also that when plaintiff was young and when the circumstances indicated that testator was fond and proud of him testator said, speaking of his son and of children generally, that the "little sons-of-bitches" were a lot of trouble to raise. He did not then say, however, that they are not worth the trouble. There was also testimony in this connection that while plaintiff was young and before the now well known business and industrial depression and decline in land values occurred testator made statements indicating that he had raised one child because he wanted someone to whom he could leave his property and that he expected to have enough to provide substantially for his son as well as for his wife. We think the foregoing sufficiently indicates the scope and character of the evidence. If further reference to the facts is necessary it will be made in the course of the opinion.

We are of the opinion that the circuit court ruled correctly in directing a verdict sustaining the will. As appears from our statement there was no evidence of undue influence or that testator was afflicted with dipsomania or that he was in any way mentally incompetent to make a will unless because of the alleged insane delusion regarding his son. The due execution of the will was shown and is not controverted. The sole contention is that testator was obsessed by said insane delusion and because thereof was not competent to make the will in question. In such situation the burden of proving the alleged insane delusion rested upon the plaintiff. [See Hall v. Mercantile Trust Co., 332 Mo. 802, 819, 59 S. W. (2d) 664, 671 (12-13).] In the recent case of Stevens v. Meadows, 340 Mo. 252, 100 S. W. (2d) 281, 287, Division One of this court had before it a will contest case in which it was claimed that the will there in question was invalid, because the testatrix had an insane delusion regarding her children and the matter of their marriage. It was shown in that case that the testatrix was a woman of strong will, of good mind, generally speaking, and of good business judgment, but that she was unalterably opposed to any of her children leaving home, marrying or receiving attentions from persons of the opposite sex. A daughter, when about thirty-five years old, married and left the parental home and because of so doing was disinherited. She contested the will and in the circuit court obtained judgment setting it aside, which judgment was reversed by this court. In stating the law relative to insane delusions the court said:

"The subject of insane delusions has had frequent recurrence in the books, and has, many times, been defined and all definitions attempted have been substantially to the same effect. In Conner v. Skaggs, 213 Mo. 334, 1. c. 348, 111 S. W. 1132, a definition from Black's Law Dictionary was approved, which definition is as follows: 'An insane delusion is an unreasoning and incorrigible belief in the existence of facts which are either impossible absolutely, or, at least,

impossible under the circumstances of the individual. It is never the result of reasoning and reflection; it is not generated by them, and it cannot be dispelled by them; and hence it is not to be confounded with an opinion, however fantastic the latter may be.' Buford v. Gruber, 223 Mo. 231, l. c. 250, 122 S. W. 717, adopts a definition as follows: 'A delusion, which might incapacitate a person from making a will is the conception of the existence of something extravagant which has no existence whatever, but of which the person entertaining it is incapable of becoming permanently disabused by argument, reason or proof.' The law is that, 'in order for ill will, dislike, or hatred toward a natural object of the testator's bounty to void a will, it must amount to an insane delusion existing without any reason or cause, however inadequate or unjust. If a testator is capable of reasoning, and does reason to a conclusion that one of the natural objects of his bounty is unworthy of such bounty, and in his judgment, formed without undue influence, such person should not be given a portion of his property, then no jury or tribunal has a right to say to the contrary. Insane delusions are not the result of reasoning, however erroneous or unjust the result may be, but must be without any and contrary to all reason.' [Zorn v. Zorn (Mo.), 64 S. W. (2d) 626.]

"'All the mental capacity required to make a valid will, so far as judicial expression can settle, is that the testator must have 'had sufficient understanding to comprehend the nature of the transaction that he was engaged in, the nature and extent of his property, and to whom he desired to give it, and was giving it, without the aid of any other person.'"

In the instant case appellant stresses principally the fact that testator frequently cursed him and called him a son-of-a-bitch. That fact loses whatever significance it might otherwise have as tending to show that testator was possessed of an insane hatred of or delusion concerning his son in view of the further undisputed fact that the use of such language was and always had been habitual with him and was often used by him, as the evidence shows, when it could have meant nothing except a bad habit. It is also urged that testator expressed the opinion that children are a detriment rather than a benefit to their parents, that plaintiff's birth had been an accident and that he would have been better off financially if plaintiff had not been born. But in all this we can see no evidence of insane delusion or of disordered mentality such as to render testator incapable of making a valid will. Except for the cursing and the use of the epithet above mentioned testator is not shown to have mistreated his son. In other respects the evidence does not disclose that this treatment of the boy was harsh or cruel or unnatural.

Appellant cites and strongly relies on Evans v. Partlow, 322 Mo. 11, 16 S. W. (2d) 212. In that case the testator was possessed of

the delusion, without reason therefor, that the son whom he disinherited was not his son. Moreover, he subjected the boy to frequent brutal beatings, without apparent cause, until the boy was compelled to and did leave home because of such brutal treatment. There was other evidence of mental aberration. The facts are so unlike those of the instant case that we deem it unnecessary to take space to outline them. The Evans case is clearly not in point on the facts. The same is true of Buford v. Gruber, 223 Mo. 231, 122 S. W. 717, where also the testator had the unfounded and insane delusion that the daughter whom he disinherited was not his child and there was other evidence tending to show a deranged mind. Other cases cited by appellant are also distinguishable on the facts.

It is argued also that the alleged unnatural disposition of his property made by testator is some evidence of an insane delusion as to his son, a natural object of his bounty, "rendering him incapable of responding to natural impulses," and that he therefore lacked testamentary capacity. We do not think so. We have pointed out that there was no evidence of undue influence or of mental unsoundness, generally speaking. The value of the testator's estate is not shown. It appears from the evidence only that he left 407 acres of "cut-over" land, apparently best adapted to,—at least for many years prior to testator's death used for—the production of hay and pasturage, and on which sprouts kept growing and had to be kept cut down. It is too well known to require discussion or argument that when this will was made in August, 1931, real estate values and the rental value of real estate such as this were at a low ebb. Testator was fond of and devoted to his wife. She was shown by the evidence to be a good woman but of retiring, perhaps rather timid, disposition, without business training or experience, who had always looked to her husband to manage the business affairs of the family and left it to him to do so. The son had shown good business capacity, was young and in good health. In these circumstances the testator may well have felt that he should leave his property to his wife, with whom he had so long lived harmoniously and affectionately and whose industry and frugality had helped him to accumulate it, trusting to her maternal instincts to deal fairly in the end with their son as his deserts might appear to her. We know of no case holding that an unequal, or what might seem to a jury trying a will contest an unfair, distribution of his property among the natural objects of his bounty, by a testator free from undue influence and absent other evidence of testamentary incapacity, constitutes, standing alone, evidence from which a jury could legitimately find that the testator lacked testamentary capacity. So to hold would mean that no person can make a will except subject to the right of a jury in a subsequent contest thereof to set it aside and substitute its judgment as to how the will should have been made for that of the testator. There being

768

in this case no other evidence tending to show insane delusion or other testamentary incapacity and no evidence of undue influence the fact that in the circumstances shown the testator left his estate to his wife to the exclusion of his son cannot be regarded as substantial evidence sufficient to justify submitting to a jury the question of will or no will. The judgment is affirmed. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.