THE STATE v. JONES, *Appellant.*

1.  **Homicide in Self-Defense.** If one kill another in self-defense, it is justifiable homicide; and the fact that he intended not to kill but only to disable, does not make it manslaughter.

2.  **Manslaughter, Fourth Degree.** Unless a homicide is involuntary, or there is a sudden heat or quarrel, the offense is not manslaughter in the fourth degree.

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

*Walter F. McEntire* for appellant.

*D. H. McIntyre,* Attorney General, for the State.

NORTON, J.—The defendant was indicted in the St. Louis criminal court at its July term, 1881, for murder in the first degree for killing Antoine Valle on the 15th day of July, 1881. At the November term, 1881, of said court, he was put upon his trial which resulted in his conviction. From this judgment he appealed to the St. Louis court of appeals, where the judgment was reversed and the cause remanded for another trial. He was re-tried in the criminal court at its January term, 1883, which again resulted in his conviction for murder in the first degree and he was sentenced to be hanged. From this judgment defendant appealed to the St. Louis court of appeals, where the judgment was affirmed, and from this judgment of affirmance he has appealed to this court.

The counsel assigned to the defense of the accused has shown commendable zeal in conducting it, and seeks a reversal of the judgment on the alleged erroneous action of the trial court in not giving an instruction for manslaughter in the fourth degree, and also in giving the following: "In this case the defendant contends that he is not guilty of any offense, because, what he did he acted in self-defense, and that the shooting of Antoine Valle by the defendant was necessary to prevent the inflicting upon him, the defendant, of great bodily harm by Antoine Valle."

In order that these objections may be disposed of intelligibly, it will be necessary to state the substance of the evidence. It appears that some days previous to the homicide deceased and defendant, who were working as boat-hands on the Lady Lee, a steamboat plying between

the city of St. Louis and Kansas City, had a difficulty on board the boat about twenty-five miles below the latter place, and that deceased struck defendant with a piece of cord-wood, cutting his ear and knocking him down; that defendant then left the boat and returned to the city of St. Louis by rail, arriving there on Tuesday; that the Lady Lee returned to St. Louis on the following Friday; that defendant soon after the arrival of the boat went aboard and shot the deceased under the following circumstances, as detailed by Daniel Follio, ship-carpenter:

"About the middle of July, 1881, I was working on the steamboat Fannie Lewis. She was lying at the Missouri wharf-boat. The Lady Lee came in and landed on the outside of us. Was working on the starboard guard on the staging. Didn't know Antoine Valle; didn't know Emmett Jones, the defendant; saw Jones after he got aft of the boilers on the deck-room of the Lady Lee. He walked aft to the hammock that the man was sleeping in. I saw him walk back from the boilers to the hammock, step up on some boards that were lying there, put his hand in the hammock to see who was in there, look into the hammock, then step back, cocked his pistol, stepped upon the boards again and shot him. The man raised a little ways, groaned once; as he fell back he shot him again. He got down and walked aft. He (Jones) had a rag or handkerchief tied around his head. He walked aft the boat, and that is the last I saw of him. He had to walk twenty or twenty-five feet from where I first saw him, to get to the hammock. The lumber was lying near the hammock in piles about eighteen inches high. To reach the hammock he got up on the lumber. He remained just long enough to look in. The deceased didn't say anything. The hammock was swung on car lines, about eight feet high. It swung about seven feet from the deck. I didn't see the man in the hammock until he raised his head and shoulders. I should judge he raised up from eight to ten inches. This was after the first shot was fired. He groaned once and

fell back. Didn't see the man move in the hammock until the first shot was fired.'

There was other evidence corroborative of the testimony of this witness.

Defendant testified in his own behalf, and after stating the particulars of the difficulty between deceased and himself, which occurred on the boat a short distance below Kansas City, proceeded as follows: "I stopped at Glasgow, went to a drug store and got my ear fixed, and took passage on the Chicago and Alton for St. Louis; got to St. Louis Tuesday morning, went to a drug store here, got some more medicine—some oil and lint—and fixed up my ear, stayed here until Friday, and Friday afternoon the boat came in, and I met some fellows off the boat and they said, 'How are you getting;' and I said, 'I am living yet;' and they said, 'Antoine is going to kill you as soon as he sees you;' I said, 'for what?' They said, 'You had better watch him, he is going to kill you.' On Saturday morning I went down to see Antoine, if he would fix this thing up; about half-past eleven, I think it was, when I got to the boat; I went to the boat for the purpose of asking Antoine if he would pay me my doctor's bill, or help to pay it, while I was not able to work; he was in his hammock; I went to the hammock and got him by the elbow, shook him, and he woke up; he got up and put his right leg out of the hammock, and said: 'Why you — of a —, I will blow your brains out,' and started back for his gun; and just as he said that, I run my hand in my pocket and pulled out mine and shot; I meant to shoot him in the muscles of the arm to disable him; I didn't intend to kill him, God knows I didn't intend to do that; he would have shot me, God knows he would; the gun went off, and before I could get the gun out of that position it went off again, contrary to my notion; I had no intention of shooting the second time; I don't know how it went off."

It is clear to our minds that the evidence of the only person who witnessed the killing of deceased except the

defendant himself would not have warranted the court, in giving an instruction as to any other grade of homicide than that of murder in the first degree; and it is equally clear that the evidence of defendant, the only other witness to the transaction, would not have warranted the court in giving an instruction authorizing a conviction in any of the degrees of manslaughter. The evidence of defendant was sufficient to justify the court in giving an instruction on justifiable or excusable homicide and nothing more. If his evidence was true, and he shot the deceased to prevent the deceased from shooting him, then he was guiltless of any crime, and that the fact that he shot at the deceased as he stated, not intending to kill, but to disable him, so that he could not shoot him, makes it none the less a justifiable homicide, committed in self-defence.

It is not claimed by counsel that the facts in evidence would warrant an instruction either for manslaughter in the first, second or third degrees; but it is insisted that an instruction for manslaughter in the fourth degree ought to have been given. We are of a different opinion. Manslaughter in the fourth degree is the involuntary killing of another in the heat of passion, or any homicide which would be manslaughter at common law, and which is not excusable nor justifiable, or is not declared to be manslaughter in some other degree. The circumstances under which this homicide was committed, do not bring the case under this definition because of the absence of heat of passion. There was no sudden heat or quarrel or involuntary killing, bringing the case either under section 1249 or 1250 Revised Statutes.

The instruction hereinbefore stated and complained of is subject to verbal criticism, and nothing more. It was merely introductory to the instruction given by the court immediately following it on the law of self-defence, .which gave to the defendant the benefit of the law on that subject in the most favorable light possible for him. The evidence shows that both shots took effect on the right breast

of the deceased, one about one-half inch below the right nipple, and the other about two inches below it, and from the range of the balls and the direct evidence, deceased was shot to death while lying down in the hammock.

Two juries have passed upon the question of defendant's guilt, and as the verdict of the jury is fully supported by the evidence, and as we find no reversible error in the record the judgment is affirmed, all the judges concurring.