## THE STATE v. ACE COCKRIEL, Appellant.

Division Two, May 28, 1926.

1. CONTINUANCE: Immaterial Evidence: Insanity: Defective Eyesight. An affidavit, made in support of defendant's application for a continuance, charged with murdering his wife, wherein the defense is insanity, to the effect that affiant, defendant's sister, had made diligent effort to procure the records of ex-soldiers, which would show that defendant had received injuries in the army which unbalanced his mind, but not stating what injuries, if any, he received, or that he had not recovered from the injuries at the time of the later homicide, does not state evidence material to the defense, where it is apparent from the evidence produced at the trial that the injuries defendant suffered while in military service were to his eyes, that he had recovered from those injuries before he married deceased, that he had later engaged in work which required good eyesight, that he was a reckless driver of automobiles, and had been arrested for driving at excessive speed.

2. ———: Absent Witnesses: Cumulative Evidence. In the trial of defendant for murder, wherein the defense is insanity, the court did not abuse its discretion by denying an application for a continuance, based on affidavits, wherein it was stated that certain absent per-

sons if present would testify that defendant at the time of the homicide was of unsound mind, where defendant at the trial produced numerous witnesses who, testified that he was insane at and long prior to the homicide, and the evidence of the absent witnesses if produced would have been merely cumulative.

3. **EVIDENCE: Opinion of Lay Witnesses: Sanity.** A lay witness may testify that the defendant was sane at and prior to the homicide, without stating the facts on which he bases his opinion. The rule that where a lay witness is called to testify that an individual is insane, he must first state the facts on which he bases his conclusion, does not apply where| the witness is called to testify that the person whose mental condition is under inquiry is sane.

4. ————: **Allegations in Petition of Deceased for Divorce: No Objection.** It will not be ruled that error was committed in admitting in evidence that portion of the petition of the deceased wife for a divorce from defendant, charged with murdering her, which her attorney had previously read to him, where it was admitted without objection, and is not preserved in the bill of exceptions.

5. **CROSS-EXAMINATION: Objectionable Questions: Non-Prejudicial.** In the trial of defendant for murdering his wife, wherein the only defense was insanity, and wherein a witness, who was the husband of defendant's sister, had testified to many facts and circumstances on which he based his opinion that defendant's mind was addled when he entered the army in 1917 and that he had been insane ever since his return, and that neither he nor defendant's mother or sister had ever made application to have him placed in an insane asylum, questions asked said witness on cross-examination to the effect if the first time he learned that defendant was insane was not after the murder charge was made, if insanity was not the only defense defendant could have, and if the homicide was not the witness's reason for claiming insanity for him, were objectionable as argumentative, but they were not prejudicial.

6. **MISCARRIAGE OF JUSTICE: Incompetent Counsel: No Assignment in Motion.** If the contention that defendant's attorney was grossly ignorant of the law and incompetent to conduct the defense was not made a ground of the motion for a new trial, and the trial court was not therefore given an opportunity to rule upon the point, it cannot be sustained on appeal. But if the point had been properly made in the motion for a new trial, it would in this case be held that there is nothing in the record to support it, and therefore the contention that there has been a complete miscarriage of justice is without merit. It is only when the incompetency of counsel is so great that defendant is prevented from fairly present-

State v. Cockriel.

ing his defense, and prejudice and serious error in the conduct of the case result therefrom, that the incompetency of counsel will authorize a new trial.

7. **MURDER: Corpus Delicti.** The proof of the *corpus delicti* is established by the death of deceased and defendant's criminal agency in causing her death, and in this case is clear and conclusive.

8. ———: **Insanity: Burden.** The burden of establishing the defense of insanity rests upon the defendant, and its determination, under proper instructions, is for the jury.

9. **MURDER: Insanity: Characteristics.** Insanity is an insidious disease, and sometimes difficult of diagnosis; but it is a question for the jury to determine, and where the evidence preponderates against said defense, and the question is submitted by proper instructions, the verdict of guilty, which is necessarily to the effect that defendant was sane at the time he killed his wife, will not be held to be a miscarriage of justice.

10. ———: ———: **Intoxication: Instructions: Interference with Verdict.** Where the instructions given followed forms frequently approved, and fully informed the jury upon all questions of law arising in the case and necessary for their guidance in returning their verdict, including reasonable doubt, the presumption of innocence, the burden of proof, and the defenses of insanity and intoxication at the time defendant shot and killed his wife, and the indictment clearly charged the defendant with the crime of murder in the first degree, and the verdict, upon every issue, was supported by substantial evidence, and found defendant guilty of murder in the first degree and fixed his punishment at life imprisonment, and no procedural errors appear in the record presented here, this court will affirm the judgment.

Corpus Juris-Cyc. References: **Criminal Law,** 16 C. J., Section 821, p. 451, n. 91; Section 838, p. 465, n. 73; Section 921, p. 501, n. 88; Section 1002, p. 531, n. 81; Section 1540, p. 751, n. 99; p. 752, n. 4; Section 2285, p. 925, n. 57; Section 2642, p. 1145, n. 37, 39; 17 C. J., Section 3349, p. 87, n. 43; p. 88, n. 50; Section 3557, p. 211, n. 5; Section 3656, p. 311, n. 20. **Homicide,** 30 C. J., Section 559, p. 312, n. 42.

Appeal from Jackson Circuit Court.—*Hon. J. H. Austin,* Judge.

AFFIRMED.

*Walter E. Walsh, Jerome Walsh* and *Joseph R. Stewart* for appellant.

(1)   The trial court abused its discretion over the objection and exception of the defendant in compelling the defendant to go to trial, in that it gave the defendant but seventeen days from the return of the indictment and but twenty-five days from the date of the alleged offense to employ counsel, prepare for trial, procure depositions as to injuries contained in the records of the United States Government at Washington, D. C., and to obtain the evidence of important witnesses, which could not possibly be done within such a short period of time.  State v. Salts, 263 Mo. 304; State v. Tettanton, 159 Mo. 354; State v. Riddle, 179 Mo. 287; State v. Arnold, 267 Mo. 33; State v. Sovern, 225 Mo. 580; State v. Sublett, 191 Mo. 163.   (2)   The court erred in admitting in evidence the opinion of the witness Merrill Come, that this appellant was sane, for the reason that the said witness did not know the appellant, had not seen or observed him for a sufficient length of time, did not state facts or circumstances upon which to base his opinion, and was not qualified to give or express an opinion on that subject. And the court erred in admitting in evidence the opinion of witness Benton, that this appellant was sane, for the reason that the said witness did not know him, did not state facts or circumstances upon which to base his opinion, had not seen or observed him for a sufficient length of time, and was not qualified to give or express an opinion on that subject.   State v. Erb, 74 Mo. 199; State v. Klinger, 46 Mo. 229; State v. Morris, 263 Mo. 339; State v. Speyer, 194 Mo. 459.   (3)   The court erred in admitting in evidence over the objection and exception of the defendant, the petition for the divorce filed against the defendant by the deceased, for the reason that the petition was not a document admissible under any rule of evidence.  The statements and allegations therein contained were made outside of the presence of the accused, were conclusions of the pleader, *ex parte,* voluntary state-

ments, and defendant was denied the right of cross-examination with reference thereto, as the party making them was dead, and were highly improper and prejudicial evidence and directly calculated to poison and arouse the minds of the jury against defendant. State v. Newcomb, 220 Mo. 54; State v. Jaeger, 66 Mo. 173; State v. Rotchschild, 68 Mo. 52. (4) The court erred in permitting highly improper and judicial questions to be asked in the cross-examination of witness Covert, and in failing to reprimand assistant prosecuting attorney, at the request of the defense attorney. State v. Miller, 263 Mo. 326; State v. Wellman, 253 Mo. 302; State v. Hess, 243 Mo. 147; State v. Bobbst, 131 Mo. 328; State v. Webb, 254 Mo. 414. (5) The trial of this cause was a complete miscarriage of justice. The defendant was not given a fair and impartial trial. He was referred to in the presence of the jury as a murderer. The scene of the homicide was referred to as the place of the murder. Rules of evidence were laid aside, hearsay evidence, opinion evidence without qualification, or statements of fact, statements made outside the presence of the accused, improper evidence and highly prejudicial statements and objections were placed before the jury. Statements and questions were made and asked by the prosecuting attorneys which could have no other purpose than to prejudice the jury against the defendant. Witnesses for the defense were rebuked and belittled and the defense offered was treated with ridicule and contempt. Defendant's counsel in the trial of this cause was grossly incompetent and ignorant of the law. He referred to the scene of the homicide as the place of the murder, the time of the occurrence was referred to as the time of the murder. Witnesses were placed on the stand by defendant's counsel to prove the value of real estate, and while the defense was insanity, witnesses were placed on the stand by defendant's attorney for seemingly no purpose and were permitted, on cross-examination by the State, without objection, and not being qualified or giving any facts or circumstances upon which the opinion was based, to say

that the defendant was sane. State v. Jones, 13 Mo. App. 93; Lamento v. United States, 4 Fed. 901.

North T. Gentry, Attorney-General, and Claud Curtis, Special Assistant Attorney-General, for respondent.

(1) There was positive evidence to prove the corpus delicti. The corpus delicti in murder cases consists of two elements: 1, the death of the person alleged to have been murdered; 2, the criminal agency of some person causing the death. State v. Poor, 286 Mo. 644; State v. Underwood, 263 Mo. 677; State v. Bowman, 294 Mo. 245. (2) The court committed no error by overruling defendant's motion for continuance. This matter is largely within the discretion of the trial court. State v. Tracy, 294 Mo. 372; State v. Williams, 263 S. W. 198; State v. Cain, 247 Mo. 700; State v. Salts, 263 Mo. 304. There was no allegation in the affidavit for continuance that it was not safe for defendant to go to trial without these witnesses, that the witnesses had been summoned, or that they had left prior to the docketing of the case. The showing in the affidavits was not sufficient. State v. Tettaton, 159 Mo. 373; State v. Riddle, 179 Mo. 287; State v. Carter, 98 Mo. 176; State v. Taylor, 266 S. W. (Mo. App.) 1017; State v. Belknap, 221 S. W. 39; State v. Morris, 263 Mo. l. c. 347. If the testimony of the witnesses mentioned in application for continuance is not such as ought to change the result of the case, the overruling of such application is proper. State v. Temple, 194 Mo. 251. (3) Non-expert witnesses may give opinion as to sanity of defendant without stating facts upon which such opinion is based. State v. Liolios, 285 Mo. 13; State v. Soper, 148 Mo. 217. If witness is called to give his opinion as to insanity of defendant he must give facts upon which he bases such opinion. State v. Speyer, 194 Mo. 459. (4) The questions asked by the prosecuting attorney on cross-examination and complained of by defendant do not constitute reversible error. If such questions are asked in good faith and are not prima-facie

prejudicial there is no error.   State v. Miles, 199 Mo. 530;
State v. Anderson, 274 S. W. 19.

HIGBEE, C.—The appellant was indicted on Octo-
ber 3, 1924, in the Circuit Court of Jackson County, for
the crime of murder in the first degree.  His trial began
on October 20th, and a verdict was returned on the 24th,
finding the defendant guilty of murder in the first degree
and assessing his punishment at life imprisonment in
the penitentiary.   Motions for new trial and in arrest
were filed and overruled, and thereafter, on November
8th, sentence was pronounced in accordance with the
verdict and the defendant appealed.

The indictment charges that the defendant shot and
killed Nina Cockriel, who was the defendant's wife, on
September 25, 1924.   It properly charges murder in the
first degree.   He was arraigned on October 3rd, and en-
tered a plea of not guilty.   The cause was set for trial on
October 13th, at which time, on an application for a con-
tinuance, the case was set for trial on October 20th.   That
the defendant shot and killed his wife, as charged in the
indictment, was not questioned at the trial, nor is it ques-
tioned on this appeal; the sole defense interposed was
insanity.

The defendant, at the time of the homicide, was thir-
ty-nine years of age; the deceased was twenty-two; she
was his second wife; they had been married less than five
years.   The defendant's mother had conveyed to them,
as husband and wife, a house and lot in Kansas City,
where they lived until they separated about six weeks
before the homicide.   The defendant had been working
as a pressman in the printing office of the Unity School
of Christianity for about three years, and his wife also
was working there as a clerk.   When they separated she
secured a room in the residence of Mr. and Mrs. Robins
S. Carey, Mrs. Carey being one of her friends.  On the
night before the homicide, about midnight, defendant
came to the Carey house, asked to see his wife, was ad-
mitted, and went into his wife's bedroom.   Mr. Carey

testified that he heard their conversation; the defendant wanted her to make an appointment to settle their property.; she asked him why he did not leave her alone, saying she did not want to live with him; he wanted a settlement of the property or he would do something desperate to her. He talked so loud that he wakened Carey's baby, and Carey told him to leave the house. The next evening defendant went to Carey's drug store and talked about the trouble with his wife; he said if she didn't make an appointment to settle the property there would be serious trouble; that he didn't care about going back to live with her. Defendant talked to him about twenty minutes and left. In a short time Mrs. Carey came to the drug store. Mr. and Mrs. Carey went home about ten P. M. and, learning of the homicide, Carey went to the police station, where he met the defendant. Defendant said to Carey, "I told you I was going to do it." Defendant also made this statement to others who testified at the trial.

Ruth Williams, who worked at the Unity School with Nina Cockriel, testified: Nina and I went to a theater on the evening of September 25th, and I accompanied her to the Carey house, arriving there about nine P. M. We saw a man sitting on the porch. It was dark and we did not recognize him. There were no lights in the house. Mrs. Cockriel asked the man who he was. Cockriel said, "It is me, honey." We went up on the porch, and Cockriel asked, "Is this Mrs. Carey?" Nina told him it was Ruth Williams. He said, "Where have you been?" Mrs. Cockriel said, "To the show." He said, "Where were you last night?" She said, "To the show." Cockriel said, "What show?" She stepped back and said, "Do I have to tell you?" And then he swore, "God damn you, answer me," and pulled his hand out from his side and shot her. She stood for about five seconds and then fell over on me, and I could see that she was shot; and then she fell to the floor. As she fell he fired another shot and went over to the other side of her and lay down; fell down gradually on the porch and threw the gun down

as he fell. She mumbled a few words, but they were not intelligible. There was a man on a porch; I told him the situation, and he called the police. They came and took Cockriel to the hospital and her to the undertakers. She always seemed to be an awfully sweet girl.

Merrill Come, who lived about two hundred feet from the Carey house, heard the two shots and went there at once. He testified: I found a man and a woman lying on the porch; the woman was dying; he didn't seem to be badly hurt. She died while I was there. The man was the defendant. I found this revolver there about two feet from his head. There were two empty shells and three loaded shells in the revolver. He said, "I have killed my wife and I have shot myself through the heart." He talked in a normal, natural way and was rational as far as I could tell. He had been drinking some, but was not intoxicated. He was taken away by the police; the body of the woman was taken away in the undertaker's wagon. I did not know either of the parties. I saw the defendant later that night at No. 7 Police Station. He met Mr. Carey in the hallway and said, "I told you I would do it." I heard a conversation the next morning in the prosecuting attorney's office between him and the warrant deputy, questioning and answering, about twenty minutes. I believe the defendant was sane.

Cross-examination: I was with him three hours the night before. He wasn't raving. He stayed quietly on the porch and asked for cigarettes and smoked. I asked him if he killed this woman and he said, "Yes, I did." I said, "Is this your gun?" He says, "Yes, that is my gun. I bought it yesterday for that."

Redirect: The prosecutor asked him if he wanted to plead guilty. He said, "Well, I don't know; I am here and she is gone, and I want to get the best I can out of it." The prosecutor asked him if he knew that a plea of guilty of murder in the first degree would probably bring a hanging sentence, and he said, "Do they hang people in Missouri?" The prosecutor assured him they did. The defendant said, "They haven't hung anybody

in Missouri for a long time, have they?'' His attorney came in about that time and told the prosecutor that defendant's mother did not want him to plead guilty. I believe it was Mr. Childers.

Mrs. Carey testified: I was in Mrs. Cockriel's house much during her married life. I have never seen him mistreat her but once, but she has told me lots of things. When he had a restaurant at Fifteenth and Holmes Street about two years ago, she was cooking in the restaurant. I was there one evening and he slapped her. He wanted to go out with a man and she didn't want him to go. She said, I want you to stay with me because I am scared to stay down here in this neighborhood by myself. He said, Well, I am going, and he slapped her.

On September 19, 1924, the defendant and his mother called at the law office of Mr. Chilcott, who had prepared a petition for divorce and partition of the property held by the defendant and his wife. Defendant inquired the grounds for divorce and Mr. Chilcott·read the charges in the petition to him. He did not deny any of the charges. He said he didn't care about living with her any more; that she had been in the hospital and had two operations performed; that the best part of her was in the hospital; that sexually she was no longer a wife to him, and he didn't care whether she lived with him any more or not; that he would see that she delivered that property to his mother. The petition was filed on September 20th, and an order obtained restraining the defendant from molesting Mrs. Cockriel in any way. The petition was offered in evidence but, defendant's counsel objecting except as to the portion which was read to the defendant, that portion only was admitted in evidence. It is not preserved in the bill of exceptions.

Witness continuing: He (Cockriel) said he would not contest the divorce, but he was not going to let her have this property. He and his mother were in the office from one-half to three-quarters of an hour. He appeared to be perfectly sane.

Cross-examination: Q. You stated in that petition for divorce that she (Nina) was afraid he would kill her, did you? A. No, I think the petition will show that he had attempted to kill her once before. Q. Did Nina Cockriel tell you that he had attempted to kill her? A. Yes, he attempted to kill her by driving an automobile into a lake. Q. Was he in the car with her? A. Yes. Q. Did she tell you of any other acts that he did that were questionable as to a man and wife? A. She told me about his beating her up. And down at the restaurant somewhere close to Fifteenth Street, she told me about him grabbing her by the hair and pulling her around in that restaurant and beating her. She said he got drunk and mistreated her. When he was drinking he beat her. She said that when he attempted to drown her, that I have just spoken of, she left him and went to her brother in St. Paul or Minneapolis. She told me they had a joint bank account and on the day he left he checked out all the money and overdrew the bank account. She said he worked regularly except when he got drunk. I asked if she loved him; told her she shouldn't get a divorce if she had any affection for him; she said he had killed all her affection by the manner in which he did and leaving her in the circumstances he did. She told me he had repeatedly called her up and tried to get her to come and talk with his mother and sister about this property settlement. He told me she was over there and talked to his mother and sister and him the night before he was at my office. I talked with her about that and she said they wanted her to sign and execute a deed to his mother for this property.

Dr. Herman J. Just met the defendant at the hospital when he was brought in on the evening of the homicide. He had two wounds above the heart, one where the powder had burned, and about two inches to the left was a superficial wound where the bullet came out; just a flesh wound. He talked some; he was under the influence of liquor and my impression was that he was no different than the ordinary person. He was not at the point

of staggering; he articulated clearly; he talked rationally. The only thing I remember is that he had planned it for some time and he had a paper in his hand which he read to the officer. I don't know as to the essence of the paper—the cause and why he did it. I thought the way he acted he was a normally sane person.

In short, the evidence for the prosecution is that defendant bought the revolver, planned the deed and was "lying in wait" for his wife when she came to her home at the Carey house.

The evidence for the defense is voluminous: it is thus summarized by the Attorney-General:

"Fred R. Covert, witness on behalf of the defendant, a minister, testified that defendant had been at his home several times and seemed to be mentally deficient; defendant had threatened to take poison or to do other acts which would mean suicide; his mental condition was worse after he came back from the army than it was before he went; defendant would sometimes get lost and would have to ask people how to get home; he often came to the house of his wife's sister and asked for his wife and at that very time his wife would be at his own home; he would walk the floor and cry for his wife to come back to him.

"Defendant's mother testified that he had been a sullen morose boy ever since childhood; that he was never able to learn in school and that he had always had peculiarities; he had become worse since his domestic troubles had developed, and she was at all times afraid he would kill himself.

"Several other witnesses offered by the defendant also testified that, in their opinion, defendant was insane. However, some two or three witnesses offered in behalf of the defendant believed him to be sane."

The court appointed a committee of three specialists in psychopathy, or mental diseases, to examine the defendant as to his sanity, Doctors A. L. Ludwick, G. Wilse Robinson and Edward T. Gibson, who together examined the defendant. Their examination was thorough and

their evidence is interesting, but we need not go into detail. Dr. Ludwick was of the opinion that the defendant was insane at the time he was charged to have shot and killed his wife, while the other specialists were of the opinion that he was sane.

I. Error is assigned in the refusal of appellant's application for a continuance. There were four affidavits filed in support of the application: the first by Mrs. Minnie Covert, defendant's sister; the other three by Mrs. Minnie Covert and Mrs. Rosa Cockriel, the defendant's mother. The first affidavit is to the effect that she had made diligent effort to procure the records of the ex-soldiers at Washington, D. C.; that those records would show that the defendant had received injuries in the army which unbalanced his mind and that it would require the taking of depositions in Washington, which would take at least thirty to sixty days before the notes were transcribed; that the facts above shown cannot be conclusively shown by other witnesses available; that if a continuance be granted affiant would make diligent effort to secure these records or this evidence within a reasonable time, and that affiant believes that the records above mentioned will prove the facts herein set out.

*Continuance.*

This affidavit does not state that the defendant was in the military service of the United States or what injuries, if any, he received therein; there is the bald conclusion that he "received injuries in the army which unbalanced his mind." It is not stated that the defendant had not recovered from these injuries at the time of the homicide. On the other hand, Fred R. Covert, the defendant's brother-in-law, a witness for the defendant, testified at the trial that he had known the defendant for ten years; that he was in the army two years; that his mind was addled when he joined the army in 1917; that when he returned he was nearly blind and his mind was not as good as when he went away; that he was sick and unable to work for more than a year; he came back

about six months after the armistice and he was ordered back to the hospital for treatment and they were talking about taking his eyeballs out; he was not yet discharged.

It is apparent that the injuries defendant suffered while in military service were to his eyes and that from all the evidence he had recovered from these injuries before he married the deceased. He was engaged in work which required good eyesight; he was a reckless driver and had been arrested in Kansas City for driving in excess of the speed limit. The evidence sought for was not shown to be material.

The other affidavits relate to witnesses residing in Kansas City who were at the time traveling outside of the city. It is averred they knew the defendant intimately and, if present, would testify that he was of unsound mind at the date of the alleged homicide. They fail to state facts on which these lay witnesses based the conclusion of insanity and, in this and other respects, do not comply with the requirements of Section 3997, Revised Statutes 1919, relating to continuances. But, waiving that, the defendant produced numerous witnesses at the trial who testified that he was insane at and long prior to the homicide, so that the evidence of the absent witnesses and the records at Washington would have been merely cumulative. No case was made for a continuance under the statute. The granting of a continuance is a matter largely within the discretion of the court. It does not appear that the court abused its discretion in overruling the application. [State v. Tracy, 294 Mo. 372, 380, 243 S. W. 173, and cases cited.]

II. It is insisted that the court erred in admitting the testimony of the witnesses Merrill Come and G. C.

Opinion
Evidence.

Benton that the defendant was sane, because they did not know him and did not state the facts and circumstances on which they based their conclusions, and were not qualified to express an opinion as to his sanity. Come had no previous acquaintance with the defendant. His evidence is set out, in

part, in the statement of the case. Benton testified he had known the defendant about a year, not very well; had talked with him; that from his observation and knowledge of the defendant he would say he was sane. The rule is that where a lay witness is called to testify that an individual is insane, he must first state the facts on which he bases that conclusion. "The rule is otherwise, however, where the witness is called to testify that the person whose mental condition is under inquiry, is sane." [State v. Liolios, 285 Mo. 1, 14, 252 S. W. 621, citing State v. Soper, 148 Mo. 217, 235, 49 S. W. 1007.] There was no error in the admission of this evidence.

III. It is urged that the court erred in admitting in evidence, over the objection of the defendant, the petition for divorce filed against defendant by the deceased; that the allegations therein were not made in the presence of the defendant and were prejudicial.

**Divorce Petition.**

The defendant asked Mr. Chilcott, the attorney who drew the petition, what were the grounds for the divorce and Chilcott read the charges in the petition to the defendant. Only that part of the petition was admitted in evidence and there was no objection to its admission. It is not preserved in the bill of exceptions.

IV. The fourth assignment is that the court erred in permitting "highly improper and judicial questions" to be asked in the cross-examination of witness Fred R. Covert and in failing to reprimand the prosecuting attorney.

**Cross-Examination: Objectionable Questions.**

The witness, Mr. Covert, married the defendant's sister, and was one of the principal witnesses for the defense. He had testified to many facts and circumstances on which he based his opinion of insanity; that defendant's mind was addled when he entered the army in 1917 and that it was not so good when he returned at the close of the war, and that the defendant was and had been insane since his return. The witness, who is a minister of the gospel and prominent in

his church, was asked if he or the defendant's mother or sister ever made application to have the defendant put in an insane asylum, which he answered in the negative. Witness was then asked:

"Q. So the first time you learned he was insane was after this murder charge had been brought? A. No, sir.

"Q. That is the only defense he could have in this case isn't it, Doctor? And that is the reason you are now claiming he is insane?"

Defendant's counsel said: "I object to counsel's insisting on making damaging statements to prejudice a fair-minded jury, and I ask the court to reprimand counsel for this action and for repeatedly doing it."

THE COURT: "Proceed." An exception was saved.

The fact is that insanity was the only defense that was made. Witnesses had testified that defendant said he shot his wife; "that is what I said I would do;" that he bought the revolver for that purpose and that he had planned to do it. Counsel objected to damaging statements; there were no statements. He probably meant that the question was unfair and prejudicial. It was objectionable as being argumentative, but it was not prejudicial.

V. The last assignment is that the trial of this cause was a complete miscarriage of justice, and that the defendant's attorney was grossly incompetent and ignor-

Miscarriage of Justice.

ant of the law. Mr. Judy appeared as counsel for the defendant at the trial. If this most unusual contention had been called to the attention of the trial court in the motion for new trial and were properly before us, we would have to hold there is nothing in the record to support it.

Counsel cite in support of this contention, State v. Jones, 12 Mo. App. 93. In that case the defendant was convicted of murder in the first degree and sentenced to be hanged. A motion for a new trial was filed on the ground that the conviction was due to gross ignorance, incompetence and imbecility of the defendant's attorney.

The motion was overruled. On appeal it was held that, on the showing made, the court erred in overruling the motion and a new trial was accordingly ordered. On the second trial the defendant was again convicted of murder in the first degree and the death penalty was imposed. This was affirmed on appeal. See State v. Jones, 79 Mo. 441.

The general rule is thus stated: "A new trial may be granted where the incompetency of counsel is so great that defendant is prejudiced and prevented from fairly presenting his defense, and a new trial sometimes is granted because of some serious error on the part of such attorney in the conduct of the case. But a new trial does not necessarily follow either from the attorney's incompetency or his neglect. This latter rule has been applied to the failure of defendant's counsel to introduce certain evidence, to his failure to summon witnesses, to his failure to except to a ruling or an instruction, to his negligence resulting in defendant's failure to make a statement to the court, to submission of the case to the jury without argument, and to the conduct of the defense on improper grounds. Nor will a new trial be granted solely on the ground that defendant's attorney was mentally unbalanced or that he was sick, or tired, or intoxicated." [16 C. J. sec. 2642, p. 1145.]

The contention that defendant's attorney was incompetent to conduct the defense is made for the first time in this court; it was not called to the attention of the trial court in the motion for new trial as was done in State v. Jones, supra. The learned trial court was cognizant of the manner in which the defense was conducted. It is elemental that the purpose of a motion for a new trial is to call the attention of the trial court to all irregularities and errors occurring at the trial in order that it may have an opportunity to correct its own errors and to avoid the necessity of an appeal. [State v. Burns, 280 S. W. 1026.] On an appeal this court will not consider an error not thus called to the attention of

the trial court, except errors appearing on the face of the record proper. [State v. Knight, 278 S. W. 1036 (8).]

VI.    The foregoing are all the assignments of errors appearing in appellant's brief.

The motion for new trial, however, assigns errors that have not been considered. It assigns error in giving instructions and in overruling the demurrer to the evidence.

The demurrer to the evidence was properly overruled. The proof of the *corpus delicti,* that is, of the death of the defendant's wife and of the defendant's criminal agency in causing her death, was clear and conclusive. The sole defense was insanity; the burden of sustaining that defense rested upon the defendant. That was an issue of fact for the jury, under proper instructions. On a careful consideration of the whole case we are of the opinion that there was not only substantial evidence to support the verdict, but that the evidence on that issue preponderated in favor of the prosecution.

Insanity is an insidious disease and sometimes is difficult of diagnosis. In his testimony, Dr. Ludwick related that on a visit to a hospital for the insane he was shown about the premises by an assistant for about three hours. When thanking the assistant for his courtesies, he inquired his name. The assistant replied: "They call me Taliaferro, but I am a reincarnation of Don Carlos of Spain." Dr. Ludwick considered him a paranoiac.

The following instance is related on good authority. James B. Gantt, late a distinguished member of this court, shortly after the close of the Civil War, came to Henry County from Georgia. He brought an action on a promissory note and was justly surprised and disappointed when the jury returned a verdict for the defendant. On his way from the court house to his office he met his friend Dr. B., who, noting his dejection, inquired the cause. Gantt said he couldn't practice law in Missouri; he couldn't get a verdict on a promissory note;

he would sell his library and return to Georgia. Dr. B. inquired the names of the jurors and learning that Mr. Armstrong was foreman, told Gantt that he was then treating Armstrong for insanity and suggested that Gantt file a motion for new trial. The motion was filed and Gantt put Armstrong on the witness stand who answered all questions coherently and was too much for Gantt. At the suggestion of Dr. B. and not suspecting its meaning or relevancy, Gantt asked Armstrong if he had any connection with the Secret Service. The witness instantly flew into a passion and raved like a maniac. The motion was sustained.

A singular instance occurred many years ago in the Probate Court of Schuyler County. The wife of Andrew Hicks, a farmer and country preacher, filed an information in that court, charging that Hicks was of unsound mind and incapable of managing his affairs, and praying that an inquiry be had as provided by the statute, now Section 444, Revised Statutes 1919. At the inquisition about a dozen of his neighbors testified that Hicks was insane. On cross-examination they testified that Hicks owned a 400-acre farm and was the most successful farmer and trader in the neighborhood, and they were unable to state a fact or circumstance indicating insanity, but they insisted he was insane. Hicks testified, relating his history, beginning as a poor boy, etc., etc.; that by thrift, frugality and industry he had acquired, improved and stocked his farm. The cross-examination was futile. Finally the prosecuting attorney very dramatically said: "Elder Hicks, are you not John the Baptist?" Instantly the fashion of Hicks' countenance was changed. Throwing his arms above his head and with eyes blazing like a maniac, he screamed: "Before God, I was in the isle of Patmos."

But, as we have said, the defense of insanity was a question of fact for the jury and the verdict is conclusive on that issue.

VI. The instructions given by the court are not challenged in the brief of counsel for the appellant. There are ten instructions, in addition to the forms of verdict, covering thirteen printed pages. They follow forms frequently approved and need not be set out. They fully informed the jury of all questions of law arising in the case and necessary for their guidance in returning the verdict, reasonable doubt, the presumption of innocence, the burden of proof and the defenses of insanity and intoxication. The indictment clearly charges the defendant with the crime of murder in the first degree and the verdict is in proper form. Finding no error in the record prejudicial to the defendant, the judgment is affirmed. *Railey, C.,* concurs.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.