Tressie O. Stevens v. Emma T. Meadows, Mark B. Meadows, T. J. Meadows, and Emma T. Meadows and Mark B. Meadows as Executors of the Last Will and Testament of Susie L. Meadows, Appellants.—100 S. W. (2d) 281.

Division One, January 5, 1937.

*William A. Craven* and *Lawson & Hale* for appellants.

*Moore & Moore* for respondent.

BRADLEY, C.—This is a will contest. The verdict of the jury was against the alleged will. Judgment was entered accordingly, and failing on motion for a new trial, proponents appealed.

The testatrix was Susie L. Meadows. Plaintiff Tressie O. Stevens, and defendants, Emma T. and Mark B. Meadows, are the daughters and son of testatrix. Defendant, T. J. Meadows, is the surviving husband and father. Emma and Mark were made executors under the will and were also made defendants as such. Testatrix died seized of considerable property, real and personal, and by her will gave it all to defendants, except $5 to plaintiff. The alleged will was executed March 2, 1929. "A few days after" January 18, 1929, prior to the execution of the will in question, testatrix executed a will, identical with the present will; except in the first will contestant was given $500. At the time of the execution of these wills testatrix was about sixty years old, and lived on her farm with the family, which (when the second will was executed) consisted of herself, the husband and the daughter Emma and the son Mark. At that time Emma was thirty-five years old, Mark was thirty-two, and contestant somewhat over thirty-six, being fifteen months older than Emma.

Testatrix died August 29, 1932. Contestant left home in February, 1929, shortly after the execution of the first will and shortly prior to the execution of the second will, and married May 11th thereafter.

Plaintiff alleged undue influence of Emma and Mark and an insane delusion on the part of testatrix. Undue influence was, by the trial court, withdrawn from the jury's consideration. The alleged insane delusion pleaded and found by the jury to exist was that testatrix, at the time of the execution of the will, was under the insane delusion ''that it was wrong for any of her children to marry and leave home or have any association with or receive attentions from any person of the opposite sex, and said pretended will was the product of said delusion and not of the real judgment and mind of testatrix.'' The answer, among other things, denied the existence of the alleged insane delusion.

■ Error is assigned on the refusal of proponents' demurrer to the evidence at the close of the whole case and on an instruction given on behalf of contestant. The verdict, as stated, was for contestant, that is, against the alleged will, hence in ruling the assignment on the demurrer we accept as true all the evidence tending to support the verdict, together with all favorable inferences therefrom and will disregard all evidence and inferences to the contrary. [Berkemeir et al. v. Reller et al., 317 Mo. 614, 296 S. W. 739; Yerger v. Smith et al., 338 Mo. 140, 89 S. W. (2d) 66; Evans v. Partlow, 322 Mo. 11, 16 S. W. (2d) 212.] The record discloses that testatrix was a strong-willed woman; that she was the ''head of the house'' in all matters; that she was boss and general manager in the full sense that these terms imply. She managed the farms, borrowed money when necessary and gave her own note. Neither her husband, nor anyone else, had any part in the business affairs of the family. Testatrix had what the witnesses called a high temper and it appears that when ''her will was opposed'' she became excited and angry, and that she did most of the talking whatever the subject. But, with all this, it is conceded that her mind was strong and that she was a very capable and competent business woman, and no complaint is made concerning her mental capacity except on the alleged insane delusion. Testatrix was generous with her children as to money matters and bought for them about whatever they asked for.

The circumstances related by contestant to support the alleged insane delusion are substantially these: Contestant testified that the first time there was any question raised by her mother about boys was when a young man named Crowley wrote contestant and asked if he could take her to a nearby town. The mother had contestant to write this young man and tell him that ''he couldn't come.'' After that, Crowley ''called up'' and asked to take contestant out and the mother talked to him. Contestant did not hear what her mother

said, but Crowley "did not come." A neighbor on the party line heard what was said and testified that testatrix said that she "did not allow the girls to have company." Contestant asked her mother on one occasion if Crowley could come to see her (contestant) and the mother said that "no young man would ever darken her gate to see either of her daughters." During the World War contestant corresponded with a soldier. After this young man returned home he wrote contestant several letters. The testatrix frequently asked, "What I was going to do with him? and I said, 'Well, nothing,' and I just quit writing to him." Contestant married Ernest Stevens, whom she had known from childhood, and who visited the home for several years before the mother made objection. Stevens was an automobile mechanic and "first came to work on the car and tractor and gradually got to paying attention to me (contestant) and as the years went by he came more often;" that after he had been coming to the Meadows home for about two years, "he began to come every night." Contestant testified that the mother and sisters of Stevens were usually with him, "but not always;" that the Meadows family, including testatrix, was friendly with the Stevens family, until testatrix discovered that Stevens' interest in contestant was more than friendly, and that upon this discovery both the testatrix and Emma, the sister, said, "We are going to stop that Ernest Stevens coming out here;" that Ernest came out a few times after that, "but mamma and Emma treated the family cool. They would bring them in and seat them down around the wall, pull out chairs and seat them around the wall. . . . After that occasion (when the mother and Emma said they were going to stop Stevens' coming) I seldom saw Ernest Stevens, probably not as often as once a month. My mother told me to let him alone, that I was paying too much attention to him. I was then thirty-five years old. She acted very angry towards me a good part of the time. She just didn't hardly talk to me. It wasn't so much what she said as the way she looked at me."

Then later, the Meadows family was in Excelsior Springs one night at a street dance; they stood in front of a clothing store "and the door went back and it was dark in the back entrance of the door and they wanted me to stand back there and I kept going back in the light. (Contestant had seen Stevens in the crowd, but had not spoken to him.) Finally, my mother took hold of my sleeve and just jerked me back and told me to stand back there. I jerked away from her and told her I would stand out in the light and went on back out in the light and stood there. Contestant says that when the family got home that night her mother and sister "jumped on" her; that the mother said that "I ought to be ashamed of myself—making a fool of her down on the street and so I said, 'Well, I am going to leave; if a thirty-five year old woman can't stand where she wants

to on the street, we just as well put an end to it now as later; I am not going to stay another day;'" that she started to leave, but that the mother and father "begged me so hard" she decided not to leave, but that she "told them that if they would let me alone, let me go and do as I pleased, I would stay, but that was the only circumstance, the only way I would stay." Then about two months later the Meadows family were again in Excelsior Springs. A Mrs. Hufft, cousin of contestant, gave her a note. When the family got home that night, according to contestant, the "mother and Emma just attacked me and got me down in the car and I got the note in my mouth and they told me to swallow it or give it up. (The implication is that the mother and Emma thought the note was from Stevens.) My sister took more part in it than my mother. My father came out to the car and told them to let me alone, to let me up, and they did. Then I went in the kitchen and they followed me in there and we had another fight in there over the note. The note was from my cousin, Maud Hufft, and they told me to swallow it or give it up. I was not hurt; just hysterical. Father came in again and told them to let me alone and they did. Then I went into the dining room and out through the front room and out the front door. I ran across the fields into Mr. Guy Moore's place and took out into the road and I hadn't walked but a short distance until some people came along in a car and picked me up and I came down to my cousin's, Mrs. Hufft's, in Excelsior Springs. I stayed there from Saturday night until Monday morning. Sunday my parents and brother and sister came after me. I wouldn't go home Sunday and they came back Monday. Mrs. Myers, my aunt, came with the family then. They begged me to go home. I didn't want to go. They just begged me to come home and I still didn't want to go home. I finally agreed to go. After I went back home I never heard a word from Ernest Stevens, except a time or two through my cousin, Mrs. Hufft. I never saw him all winter. In the spring I went to Lawson to visit my aunt and met Ernest up there where he was doing a little work. After that was when I told them they would have to leave me alone, and I got a few notes from him through my cousin down here, but I never saw him scarcely, but a few times when I would go to see him."

Later contestant "commenced communicating with Ernest again," and noticed that her letters were disarranged. She sometimes put her letters under the sheets and pillow cases in her room, but usually kept them in a drawer. Contestant finally left home in February, 1929, and shortly after the execution of the first will. She described her final leaving thus: "At the time I left home the last time, I wanted to go to Lawson with Mark, and I told Emma to tell Mark to wait, that I wanted to go to town with him. Emma said, 'If you go out of that door, you will never come back.' Mother came in

and heard Emma and she repeated that. I said, 'Well, if that's the way you feel about it, I am going.' There was nothing else said. I went upstairs and packed my grip and they followed me upstairs; when I came down they went to the door with me and told me I would be sorry. I said, 'Well, I am going,' and I kissed my sister and tried to kiss my mother and went out and on to town with Mark. From there I went to Mrs. Hufft's in Excelsior Springs, where I stayed about three weeks. Then I went to Kansas and stayed about five weeks, then back to Excelsior and married.''

It appears in an additional abstract by contestant that a Dr. Shasberry became interested (time not shown) in her and that she asked her mother if he could come to see her (contestant) and that the mother said that ''no young man would ever darken her gate to see either one of her daughters.'' Proponents state in their brief that the evidence about Dr. Shasberry was stricken out, but there is nothing here to support this assertion. Contestant brought such evidence here by her additional abstract. Our Rule 11 prescribes the procedure for attack upon an additional abstract. This rule, among other things, provides: ''Objections to such additional abstract shall be filed with our clerk within ten days after service of such abstracts upon the appellant, and a copy of such objections shall be served upon the respondent in like time.'' No objections, as the rule contemplates, were filed, hence we take the additional abstract as a part of the record.

Contestant further testified respecting her mother's treatment, her temper and disposition as follows: ''All the time I was at home my mother treated me all right except when this question of Ernest Stevens came up. Mother was very liberal with her money, couldn't spend enough money on us children and would get us anything we wanted. I never had any trouble of any kind with my mother except over Ernest Stevens. My mother was a kind woman, but was very firm in character and disposition. The family always did whatever my mother wanted done. She had a very high temper and would fly off awful easy at little things. I never knew her to change her mind after she had once taken a position on anything.'' It also appears from contestant's evidence that Stevens was distantly related by blood to the Meadows family.

Mrs. Maud Hufft, Margaret Ford, Miss Reba Stevens and Mrs. Cora Stevens, lay witnesses for contestant, gave their opinion as to the mental slant of testatrix. Mrs. Hufft thought testatrix was of unsound mind because ''she had to go right with'' her children when they went out among young people; that testatrix ''wanted to go where the children went.'' Margaret Ford said that she had resided at Excelsior Springs for seventeen years, and for seven years had been a nurse in the office of Dr. James; that prior to going to Excelsior Springs she resided at Lawson, near the Meadows family,

and was acquainted with the family, but was in the home only on two occasions; that the Meadows family did not visit in the neighborhood as others did; that Enid Moore was the only young person that she knew of, except Ernest Stevens, who visited at the Meadows home; that on one occasion (about a month after the marriage of contestant) testatrix and Emma were in the office of Dr. James and talked with her about contestant; that she (witness) made some comment about testatrix gaining a son; that testatrix said, "No, indeed I haven't gained a son, I have lost my daughter forever;" that "our family has been disgraced;" that testatrix was very angry and continued to talk for about five minutes, "until I left the room;" that in her opinion testatrix "acted unsound that day." Miss Reba Stevens, sister of contestant's husband, considered testatrix of unsound mind, because "she did not want her children to leave home; she did not want them to marry; she did not want them to keep company;" that she knew this, "because I was with her and her children. I got that information because we went with them in the car. We would go with them. We would go together and she always stayed with them. . . . She was unsound on that one subject. I think it is abnormal in a mother ever liking to be with her children all the time. I think they ought to be allowed a few privileges. . . . She was always with them and watched every move they made. They went to Sunday School at Lawson, attended the Presbyterian Church and went to the picture show at Lawson without her very few times. I am basing my opinion that she was of unsound mind solely on the fact that she was generally with the children, or they were generally with her—they were together."

Mrs. Cora Stevens, mother of contestant's husband, considered testatrix of unsound mind "because she did not allow her children to have company and go out with other children and be like other children. She did not put confidence in them to risk them with anybody. I know she did not, because I have been there with them and they have been at our house. . . . I have seen Mrs. Meadows have wild fits of anger several times."

Mrs. Kate Myers, sister of contestant's father, testified that on one occasion she was in the Meadows home and that Mark "was studying" and that she said, "Well, Mark, you stay with your books. We want you to be a lawyer. We haven't a lawyer in our family and we want you to be one;" that thereupon testatrix said, "I don't want you to come out here and put mischief in my child's head;" that on this same occasion or another, testatrix said that "if any of her children were to disobey her and left home, that she would disown them;" that upon this remark witness said, "Well, now Susie (testatrix), you know that if Mark would leave home, disobey you and leave home, that you couldn't disown him," and that testatrix said, "Yes, I would." Mrs. Myers further testified

that shortly after contestant was married testatrix and Mark came to her house and that she (witness) said, "Well, Susie, I see from the paper that Tressie and Ernest are married. Why not forgive them and take them back. Take her back and forget and forgive;" that thereupon testatrix "threw up her hands and began to scream;" that she "ran out the door and down the steps just hollering, saying, 'Oh, don't you think, Aunt Kate wants us to forgive Tressie;'" that witness followed testatrix to the yard, "coaxing her, trying to persuade her to not be mad with me," but that testatrix got in the car and left; that after this occasion she never saw testatrix again. Mrs. Myers testified that "from the facts I have stated here, I will say that on some questions Mrs. Meadows' mind was sound and on other questions it was not."

Dr. W. J. James, who had been the physician of the Meadows family for twenty years, testified as follows: "Assuming that the evidence in this case shows, and there is evidence in the case that tends to show, that Mrs. Meadows was a woman of high temper; that at times she showed violent temper; that she made a statement a few years before the marriage of her daughter that if any of her children ever left home, she would disown them; that she made a statement to her oldest daughter that no man should ever darken her gate for the purpose of seeing one of her daughters; that she compelled or insisted that her oldest daughter, after she was of marriageable age, not receive the attentions or correspond with two young men who wished to visit her or correspond with her; that on one occasion she became very violent because she claimed that her daughter was assisting her brother in his attentions to a young lady; that she told her daughter to pay no attention to Ernest Stevens, another young man who was at that time a close friend of the family; that afterwards, when her daughter had married Ernest Stevens and the marriage was mentioned to her, on two different occasions, she became very much excited, talked in a loud tone of voice and on one occasion hollered that 'Aunt Kate wants us to forgive Tressie' and repeated it over and over (no evidence that this was repeated over and over), and on another occasion became very much excited because of a suggestion to her that instead of losing a daughter she had gained a son, and said that she hadn't any son and had lost her daughter—assuming all of the foregoing facts with reference to Mrs. Meadows, I would say that she was a person of unsound mind on the question of the marriage of her children."

The evidence on behalf of the proponents is for the most part contrary to that for contestant. The sum and substance of the evidence of proponents is that contestant is a "chip off the block;" that she and her mother did not get along well and never had, and were frequently in disagreement. Emma, testifying about the oc-

casion when contestant finally left home in February, shortly after the execution of the first will and shortly prior to the execution of the last will on March 2, 1929, said that contestant was very angry; that she (Emma) and the mother endeavored, without avail, to get contestant not to leave; that the mother said, "If you go, Tressie, you will have to come back in sackcloth and ashes if you ever enter my door again," and that Tressie said, "Well, if that's the way you feel about it, I'm going;" that as contestant came down the stairs, she (Emma) was begging her to stay" and that after contestant "got outside" she said, "No, I'm going. I will never stay under this damn fool's roof again." Emma further testified that testatrix, in protesting the attention contestant was giving Stevens, asked contestant "if she didn't know they were kinfolks," and Emma said that testatrix thought "it wrong that they were corresponding and wanting to marry." The father of contestant was a witness for proponents. He said that testatrix and contestant did not get along well since contestant was about ten years old. However, as above stated, we are not concerned with the evidence for proponents in ruling plaintiff's case on the demurrer to the evidence.

■ It is well known that lay witnesses, giving their opinion as to mental condition, when their opinion is that the person whose mental condition is in issue, is or was of unsound mind, must state the facts upon which such opinion is based, and this because "the opinion of a lay witness as to the insanity of an individual is of no weight when not based on facts inconsistent with sanity. [22 C. J. 608; Berkemeier et al. v. Reller et al. (Mo.), 37 S. W. (2d) 430; Kaechelen v. Barringer (Mo.), 19 S. W. (2d) 1033, l. c. 1037; State v. Finley, 321 Mo. 621, 12 S. W. (2d) 27, l. c. 28; State v. Cockriel, 314 Mo. 699, 285 S. W. 440; State v. Liolios, 285 Mo. 1, 225 S. W. 941; Hunter v. Briggs, 254 Mo. 28, l. c. 54, 162 S. W. 204; In re Walter's Estate (Mich.), 184 N. W. 529; In re Murray's Estate (Mich.), 188 N. W. 381; In re Paczoch's Estate (Iowa), 211 N. W. 500; Zander v. Cahow (Iowa), 206 N. W. 90.] Also, it is the rule that courts will scan with care the evidence of lay witnesses that an individual is or was of unsound mind, to see that such witnesses have detailed "facts from which they can express an opinion upon mental capacity." [Frohman v. Lowenstein et al., 303 Mo. 339, 260 S. W. 460.]

■ Contestant's lay witnesses based their opinion that testatrix was of unsound mind on the subject of her children having attention from the opposite sex on what they saw and observed more than on anything that testatrix said. Dr. James stated that he based his opinion solely on what was incorporated in the hypothetical question; that he had "considerable opportunity to observe Mrs. Meadows in the ordinary affairs of life and business matters,

and that I would say that on those questions her mind was absolutely sound.'' The mere fact that Dr. James, from the hypothesized facts, gave it as his opinion that testatrix was of unsound mind, did not make it incumbent upon the court to submit to the jury the question of testamentary capacity. [Sayre v. Trustees of Princeton University, 192 Mo. 95, 90 S. W. 787; Berkemeier v. Reller, 317 Mo. 614, 1. c. 646, 296 S. W. 739.] ▮ The subject of insane delusions has had frequent recurrence in the books, and has, many times, been defined and all definitions attempted have been substantially to the same effect. In Conner v. Skaggs, 213 Mo. 334, 1. c. 348, 111 S. W. 1132, a definition from Black's Law Dictionary was approved, which definition is as follows: ''An insane delusion is an unreasoning and incorrigible belief in the existence of facts which are either impossible absolutely, or, at least, impossible under the circumstances of the individual. It is never the result of reasoning and reflection; it is not generated by them, and it cannot be dispelled by them; and hence it is not to be confounded with an opinion, however fantastic the latter may be.'' Buford v. Gruber, 223 Mo. 231, 1. c. 250, 122 S. W. 717, adopts a definition as follows: ''A delusion which might incapacitate a person from making a will is the conception of the existence of something extravagant which has no existence whatever, but of which the person entertaining it is incapable of becoming permanently disabused by argument, reason or proof.'' The law is that, ''in order for ill will, dislike, or hatred toward a natural object of the testator's bounty to void a will, it must amount to an insane delusion existing without any reason or cause, however inadequate or unjust. If a testator is capable of reasoning, and does reason to a conclusion that one of the natural objects of his bounty is unworthy of such bounty, and in his judgment, formed without undue influence, such person should not be given a portion of his property, then no jury or tribunal has a right to say to the contrary. Insane delusions are not the result of reasoning, however erroneous or unjust the result may be, but must be without any and contrary to all reason.'' [Zorn v. Zorn (Mo.), 64 S. W. (2d) 626.]

▮ All the mental capacity required to make a valid will, so far as judicial expression can settle, is that the testator must have ''had sufficient understanding to comprehend the nature of the transaction that he was engaged in, the nature and extent of his property and to whom he desired to give it, and was giving it without the aid of any other person.'' [Sayre v. Trustees of Princeton University, supra.]

In Conner v. Skaggs, supra, it appears that a father disinherited a daughter, who contested the will. The contest was on the grounds of undue influence and lack of mental capacity. The trial court sustained a demurrer to the evidence and on appeal this action was

affirmed. In that case the evidence as to mental capacity was directed to establishing an alleged insane delusion of the testator. Aside from the alleged insane delusion it was conceded that the testator, Joseph Skaggs, was mentally sound. No one impugned "his ability to attend to his business affairs with vigor and circumspection and he did attend to them without the aid of any supervision to the day of his death." The testator had two daughters, Lucy and Thurza. One William Conner first paid court to Lucy, the elder of the two daughters. The father got the notion Conner was unworthy and "vehemently opposed" his attentions to Lucy. Upon this opposition Conner ceased paying court to Lucy and began to secretly pay court to Thurza, who was then sixteen. (It is indicated in the opinion that Conner had his eye on Thurza all the time he was courting Lucy.) Information finally came to the father that Conner was paying court to Thurza and this he deeply resented. He had been informed that Conner was a "drunkard, a gambler and a morphine fiend." Conner was not such, but such was the father's belief. But his belief about Conner was not all that influenced the testator; he was "touched to the quick in his pride and stirred to the depths of his soul with resentment," because his daughter carried on a clandestine courtship contrary to his will and protest. Thurza married Conner and about a month thereafter the father made his will, in which he gave her one dollar, stating in the will that "she having married contrary to my expressed wishes, I wish to discriminate against her. Two years later, and through the influence of the mother, Thurza was permitted to visit the home. Thereafter she "apparently resumed her old place in her father's affections" and Conner and testator apparently became friends. Testator had named his wife as executrix of the will. After the supposed reconciliation and after the death of his wife, the testator made a codicil to his will, but the only change was that he named his son as executor. The testator "was afflicted with an infirmity of temper—a temper brittle and peppery to a degree and which he gave way to at times without check." At times this temper "lashed him into such a crest of fury that he became literally beside himself." For some time after the marriage of his daughter, when the subject was mentioned he went into a rage, "sometimes accompanied by such singular physical phenomena as 'foaming at the mouth' and 'pawing the grass.'" It is pointed out in the Conner case that when the testator made the codicil he was not "in any transport of temper."

In the present case the record shows that Mrs. Meadows first talked to her banker about the will, and when she executed both the first and last will, she was not in a transport of temper, but on the contrary, she was calm and deliberate. She went alone to her banker, Mr. Zimmerman, and told him she wanted to make her

will and said, "I will give you the facts and you can prepare it at your leisure and I will call and sign it." She told Mr. Zimmerman how she wanted to dispose of her property. The provision for her husband, Mr. Zimmerman explained, could be renounced by him, but Mrs. Meadows said that she "was satisfied he would not do it." Mr. Zimmerman told her he would send the data for the will to a lawyer friend in a nearby town and that the will would be prepared by the lawyer, and that when he got it back, he would call her. Mrs. Meadows said, "No, don't call me. No one knows that I am making a will." The will was returned to Zimmerman in three or four days and a few days thereafter, Mrs. Meadows went alone to the bank and signed it. This was the latter part of January, 1929. When the last will was made, Mrs. Meadows went alone to the bank, went in the back room with Zimmerman, closed the door and said that she wanted to change her will; that she wanted to change the $500 to Tressie to $5, and Mr. Zimmerman redrafted the will, making the change as directed, and the new will was thereupon signed and witnessed and the old will there destroyed by Mrs. Meadows.

In Everly v. Everly, 297 Mo. 196, 249 S. W. 88, it is ruled that "the question of mental capacity involves whether the testator's mind was in such condition that he recognized his obligation to the objects of his bounty and their relation to him. Undoubtedly, a very unjust disposition of his property, a disposition which would disinherit a deserving child, would be some indication of failure to understand his obligation to the child." The rule, as stated in the Everly case, was reannounced in Evans v. Partlow, 322 Mo. 11, 16 S. W. (2d) 1. c. 216. Herzog's Medical Jurisprudence, section 697 says: "While the law recognizes the fact that a man may dispose of his property in such a way as to deprive some of those related to him by marriage or family ties of any share in his estate for good reasons, it also takes cognizance of the fact that to do so without very potent reasons is likely to be due to a deranged mind, to insane delusions relating to such member of his family as he ignores or disinherits by his will." Able counsel do not call our attention to any case supporting their theory, and with diligent search, we have found none.

We are constrained to rule that contestant failed to present any substantial evidence tending to show that the will in question is the result of the alleged insane delusion. It is unfortunate that a parent should ever be so headstrong and self-determined as was Mrs. Meadows as reflected by the record, and it would be more agreeable to reach a different result than that to which we feel impelled, under the law, to reach. Mrs. Meadows may have been grievously unjust to her daughter, but if a parent, mentally capable, as this record discloses Mrs. Meadows was, disinherits her son or daughter, there is no redress if the settled law on the question of mental capacity

required to make a will is to prevail. Our conclusion makes it unnecessary to rule the assignment on the instruction.

The judgment should be reversed and the cause remanded with direction to set aside the verdict of the jury and the judgment entered thereon, and enter judgment that the paper writing in question is the last will and testament of Susie L. Meadows, and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.